KUSKIN, J.T.C.
I
Background
Plaintiff General Motors Corp. appealed the local property tax assessments on its automobile assembly plant in Linden for tax years 1983 through 2001, and defendant City of Linden filed counterclaims seeking assessment increases for all but three of those years. The 1983, 1984 and 1985 appeals are before me on *258 remand from the Supreme Court, and have been consolidated for trial with the appeals for tax years 1986 through 2001. As more fully set forth below, the parties have agreed that the first issue to be considered in connection with the resolution of the appeals is whether certain items of personal property in the plant are subject to local property tax. This opinion deals only with that issue.[1]
The proceedings before me are the most recent chapter of a long saga commencing with the filing by General Motors of an appeal of the 1983 assessment on the subject property. After many weeks of trial, the Tax Court rendered its decision with respect to that appeal in 1991. General Motors Corp. v. Linden, 12 N.J.Tax 24 (Tax 1991). The Appellate Division reversed and remanded. General Motors Corp. v. Linden, 13 N.J. Tax 324 (App.Div.), certif. denied, 134 N.J. 561, 636 A.2d 519 (1993). After the remand, defendant filed a motion, in the context of its appeals for tax years 1983,1984, and 1985, challenging the constitutionality of the following statutory provisions which were amended or added by the Business Retention Act, L. 1992, c. 24 § 1-7 (“BRA”): N.J.S.A. 54:4-lb and N.J.S.A. 54:4-1.12, both of which were amended by the BRA; and N.J.S.A. 54:4-1.16, which was added by the BRA. The Tax Court held that N.J.S.A. 54:4-lb, as amended, was facially unconstitutional, that N.J.S.A. 54:4-1.12 was constitutional, and that the challenge to N.J.S.A. 54:4-1.16 was moot. General Motors Corp. v. Linden, 17 N.J.Tax 1 (Tax 1996). The Appellate Division reversed the Tax Court’s finding of unconstitutionality and remanded the matter “for review of the chai *259 lenged assessments on their merits consistent with this opinion.” General Motors Corp. v. Linden, 293 N.J.Super. 99, 108, 679 A.2d 718 (App.Div.1996). After an extensive analysis of the constitutional issue, the Supreme Court affirmed the Appellate Division’s decision and remand. General Motors Corp. v. Linden, 150 N.J. 522, 696 A.2d 683 (1997). It is the Appellate Division’s remand of the 1983 appeal and the Supreme Court’s remand of the 1983, 1984 and 1985 appeals which are now before me, together with the appeals filed for tax years 1986 through 2001.
The Tax Court judge who decided the 1983 appeal retired from the Court before the Appellate Division reversal of his decision and remand. The Tax Court judge to whom the 1983 appeal and subsequent appeals were assigned, and who initially decided the issue of constitutionality, resigned from the court before conducting any hearings with respect to the Appellate Division’s remand of the 1983 appeal or the Supreme Court’s remand of the 1983, 1984 and 1985 appeals. All pending appeals were then assigned to me. I convened a conference with counsel to discuss the appropriate methodology for managing the many years of accumulated appeals. Counsel agreed to consolidate the appeals for trial, and that the trial would be divided into three parts, each dealing with one issue. The first issue to be heard and decided would be whether certain items of personal property at the subject plant were subject to local property taxation (the “taxability issue”), to be followed by the issue of the highest and best use of the subject property, and then the issue of the value of the subject property. Counsel further agreed that the taxability issue related only to the following items (hereinafter referred to collectively as the “Manufacturing Property”): paint spray and certain other booths, paint ovens, make-up air houses, conveyors, piping, tanks, automated storage and retrieval systems (generally referred to as stacker facilities), task lighting, and task stations.
The hearing as to the taxability issue required twenty-two trial days during which both parties presented extensive factual and expert testimony. I advised counsel that I would not review the transcript of the trial of the 1983 appeal or any exhibits placed in *260 evidence in that trial except for those portions of the transcript and those exhibits which counsel requested me to review. Counsel did not request that I review any portion of the trial transcript. I have reviewed those exhibits or portions of exhibits from the 1983 trial presented to me in the context of the hearing before me. Counsel ordered a transcript óf the hearing and thereafter submitted proposed findings of fact and conclusions of law. This opinion contains factual and legal findings and conclusions based on: (i) the trial testimony, (ii) my determinations as to the credibility of the witnesses and the weight to be accorded the testimony of each witness, (iii) the exhibits, and (iv) the submissions by counsel. In order to better understand the evidence and issues, I inspected the subject property, accompanied by counsel. I have not based any of my findings or conclusions on facts ascertained from my inspection. See Morris County Land Improvement Co. v. Parsippany-Troy Hills Tp., 40 N.J. 539, 548-49, 193 A.2d 232 (1963).
My analysis begins with a discussion of (i) the general legal standards which I will apply in deciding whether any of the Manufacturing Property is taxable and (ii) the definitions of certain statutory terminology generally applicable to my decision. I will then proceed to make factual findings and, in that context, resolve legal or definitional issues which are specific to a particular item of the Manufacturing Property. My legal and definitional rulings will be applicable to all years under appeal, even those predating enactment of the BRA in 1992. The BRA provides that it applies to assessments made after enactment and “to all tax appeals pending at the time of enactment regardless of the tax year in question.” L. 1992, c. 24, § 7. In General Motors Corp. v. Linden, supra, 150 N.J. 522, 696 A.2d 683, the Supreme Court acknowledged the Legislature’s intent to give the BRA retroactive effect, and held that permitting the Act to apply retroactively was not facially unconstitutional. Id. at 540, 696 A.2d 683.
II
Legal Issues
In a ruling before commencement of the hearing, I determined that defendant should proceed first on the taxability issue. I *261 reached that conclusion because, if this matter were tried in the normal fashion, that is, a trial involving all issues including value, the plaintiff taxpayer would be likely to present, in its direct case, valuation evidence only as to what it considered to be taxable property. The defendant municipality, in its direct case, would then present testimony as to any additional items which it contended were taxable, and then plaintiff would present rebuttal evidence. I concluded that a hearing limited to the issue of what property was taxable should proceed in a manner consistent with what would have occurred at a regular trial.
My procedural ruling was not intended to constitute or reflect a ruling on which party has the burden of proof on the taxability issue. In general, a party seeking exemption or exclusion from taxation has the burden of proving its entitlement to the exemption or exclusion. E.g. Princeton Univ. Press v. Princeton Bor., 35 N.J. 209, 214, 172 A.2d 420 (1961); Morris Tp. v. LF Assocs., 10 N.J.Tax 240, 248-49 (Tax 1988). Here, I must determine the allocation of the burden of proof in the context of a specific legislative scheme and clearly articulated legislative policy. In addition, I must determine how to apply the statutory tests for taxability. The two issues are intertwined. Deciding them now, after the conclusion of the hearing, will not result in prejudice to either party because each party presented full proofs on the taxability issue. Only after deciding these issues can I proceed to analyze the evidence as to taxability of the Manufacturing Property-
Two statutory provisions define what constitutes taxable real property: N.J.S.A. 54:4-1 and N.J.S.A. 54:4-1.12. The latter statute relates to storage tanks. The former statute is the primary definitional provision and, as amended by the BRA, states in pertinent part as follows:
Real property taxable under this chapter means all land and improvements thereon and includes personal property affixed to the real property or an appurtenance thereto, unless:
a. (1) The personal property so affixed can be removed or severed without material injury to the real property;
*262 (2) The personal property so affixed can be removed or severed without material injury to the personal property itself; and
(3) The personal property so affixed is not ordinarily intended to be affixed permanently to real property; or
b. The personal property so affixed is machinery, apparatus, or equipment used or held for use in business and is neither a structure nor machinery, apparatus or equipment the primary purpose of which is to enable a structure to support, shelter, contain, enclose or house persons or property. For purposes of this subsection, real property shall include pipe racks, and piping and electrical wiring up to the point of connections with the machinery, apparatus, or equipment of a production process as defined in this section.
Certain of the terminology used in N.J.S.A. 54:4-1 is defined in N.J.S.A. 54:4-1.15 and in regulations promulgated by the Director of the Division of Taxation. N.J.A.C. 18:12-10.1. These definitions will be set forth and discussed below.
The principal constitutional challenge asserted by defendant in General Motors Corp. v. Linden, supra, 150 N.J. 522, 696 A.2d 683, related to N.J.S.A. 54:4-1b. In sustaining the constitutionality of this provision and other aspects of the BRA, the Supreme Court discussed in detail the history of the tests for distinguishing between taxable and nontaxable property in New Jersey. Id. at 526-32, 696 A.2d 683. This history reflected an effort by the Legislature to attract manufacturing industry to New Jersey. One step in that effort was the enactment of L. 1986, c. 117 (“Chapter 117”) which amended N.J.S.A. 54:4-1 to include Paragraph a (which was not amended by the BRA) and a version of Paragraph b (which was amended in significant respects by the BRA). Chapter 117 added N.J.S.A. 54:4-1.12 (which was amended in significant respects by the BRA). The BRA was also part of the effort to attract manufacturing industry. Thus Section 2 of the Act, codified as N.J.S.A. 54:4-1.14, contains the following legislative finding and declaration:
The Legislature ... finds that in order to retain manufacturing jobs it is in the interest of the business community, municipalities and the State of New Jersey to maintain a policy regarding the taxation of business personal property which is historically consistent, equitable and competitive with neighboring states and which creates and maintains reasonable incentives for manufacturing interests to exist and thrive in New Jersey. The Legislature, therefore, declares that it is the policy of the State, through this act, to refine the definitions of real property and personal property in order to reaffirm the broad exclusion from local property taxes of business personal property used or held for use in business.
*263 As described by the Supreme Court in General Motors, the BRA was a response by the Legislature to decisions of the Tax Court which narrowed the definition of non-taxable business personal property. Id. at 530-31, 696 A.2d 683. The Court made a similar analysis in R.C. Maxwell Co. v. Galloway Tp., 145 N.J. 547, 562-63, 679 A.2d 141 (1996). In General Motors, the Supreme Court stated as follows with respect to the intent of the Legislature:
With the BRA, the Legislature continued to clarify its intent to distinguish between property integrated with the business, and property integrated with the realty upon which the business is located. The Governor’s Statement to the Senate concerning the BRA confirms this understanding. The Statement declares that the BRA was intended to restore Chapter 117’s distinction between business machinery that participates in the business, and business machinery that accommodates the business. The former was business personal property, the latter taxable as real property. An example given of the distinction was of an air-conditioning unit that dries the paint of new cars as they leave the assembly area and one that cools an office suite.
[General Motors Corp. v. Linden, supra, 150 N.J. at 532, 696 A.2d 683 (citation omitted).]
After articulating the legislative intent in enacting the BRA, the Court considered the constitutional limitations on the Legislature’s power to classify property as real or personal. The Court concluded that, although legislation relating to the distinction between taxable real property and nontaxable business personal property had evolved over the years, “[t]he one constant in the evolution of the legislation has been the intent that property traditionally taxed as real property should remain so.” Id. at 537, 696 A.2d 683. In this context, the Court held that, even though the language of N.J.S.A. 54:4-1 indicates that Paragraph b (the “b test”) was to be a separate and independent test from that contained in Paragraph a (the “a test”) for the taxability of business personal property, “we believe the Legislature did not intend that the b test override the a test in circumstances in which affixed personal property would otherwise be taxable as real property under the a test.” Id. at 536, 696 A.2d 683. The Court continued as follows:
[T]he a and b tests do not present entirely separate hurdles to surmount before an item of personal property is taxable as real property. Chapter 117 attempted to *264 describe two classes of personal property that, although affixed, do not become real property for puiposes of real property taxation.
There is first a general class of affixed personal property, with characteristics of severability without material injury (to either itself or the realty) and the absence of an intention that it remain part of the realty. A second, more specific class of personal property consists of affixed personal property that is “machinery, apparatus, or equipment” used or held for use in business. The characteristics of this class may overlap the elements of severability and absence of an intention that it remain part of the realty that are found in the a test.
The legislative reasoning contained in the Assembly Committee Statement sustains the conclusion that the b test was not designed to override the a test for the benefit of business interests.
[Id. at 536-37, 696 A.2d 683.]
In General Motors, the Supreme Court considered only issues relating to the facial constitutionality of portions of the BRA. The Court was not required to, and, therefore, did not, delineate how the a and b tests, as the Court described them relationship and respective functions, were to be applied by a trial court in a specific factual context. The Court recognized that the case-by-case application of its decision would initially be the responsibility of the Tax Court.
As we explained in Maxwell the phrase “machinery, apparatus, or equipment” does not have boundless meaning. The words must be construed consistently with the legislative intent in adopting the BRA Determining the status for taxation of specific items is best left to the expertise of the assessment community and the Tax Court.
[Id. at 540, 696 A.2d 683 (citation omitted).]
Nearly five years have elapsed since the Supreme Court’s decision in General Motors, but no published opinion has articulated a methodology for integrating the a and b tests pursuant to the guidelines established by the Court. In attempting to determine the proper application of the Court’s analysis of the relationship between the two tests, I must consider and balance the following factors: 1) legislative intent; 2) the basis for the Supreme Court’s constitutional ruling as to N.J.S.A. 54:4-1, especially the limitations on the role of the b test; and 3) matters of practicality for trial courts and the litigants. After weighing these factors, I conclude that proper implementation of the Supreme Court’s guidelines requires the following procedures (this discussion as *265 sumes that, in the context of a taxpayer’s appeal, the municipality contends that items of personal property are assessable):
1) The defendant municipality has the initial burden of producing evidence[2] that the personal property in issue is, in the words of N.J.S.A. 54:4-1, “affixed to the real property or an appurtenance thereto.” If the municipality satisfies this burden, then a rebuttable presumption of taxability is created and the burden of producing evidence shifts to the taxpayer. N.J.R.E. 301; Freehold Tp. v. Javin P’ship, 15 N.J.Tax 88, 95 (Tax 1995), cited with approval in General Motors Corp. v. Linden, supra, 150 N.J. at 530, 696 A.2d 683. The taxpayer can then present proofs as to affixation, the a test, the b test, or some or all of these issues.
 2) The municipality has the burden of persuasion [3] as to affixation;
3) If the municipality satisfies its burden of producing evidence on the issue of affixation and the taxpayer relies only on the a test to establish non-taxability, the taxpayer has the initial burden of producing evidence and the burden of persuasion as to non-taxability under the three elements of the a test;
 4) If the municipality satisfies its burden of producing evidence on the issue of affixation and the taxpayer relies on the b *266 test to establish non-taxability, the taxpayer has the initial burden of producing evidence as to non-taxability under the b test. If the taxpayer sustains that burden, a presumption arises that the three elements of the a test have been satisfied, and the burden of producing evidence as to taxability under both the b test and the a test shifts to the municipality. The taxpayer has the burden of persuasion as to the b test, but the municipality has the burden of persuasion as to taxability under the a test.
5) If the municipality satisfies its burden of producing evidence on the issue of affixation and the taxpayer fails to sustain its burden to produce evidence of nontaxability under the b test, or if the property in issue is specifically categorized by the b test as taxable real property,[4] then the taxpayer has the initial burden of producing evidence and the burden of persuasion as to nontaxability under the a test.
Under this procedure, at the conclusion of the proofs, the court will be required to address the issues as follows. First, the court must determine whether the municipality has carried its burden of persuasion as to affixation. If the court concludes that the municipality has satisfied this burden and the taxpayer has relied only on the a test, then the next issue for decision will be whether the taxpayer has earned its burden of persuasion as to the a test.[5] If the court concludes that the municipality has satisfied its burden of persuasion as to affixation and the taxpayer has relied on the b test, the court must decide whether the taxpayer has *267 satisfied its burden of persuasion as to non-taxability under the b test, or whether the property in issue is categorized as real property under the b test. If the court concludes that the taxpayer has satisfied this burden, then the court must determine whether the municipality has satisfied its burden of persuasion as to the a test. If the court concludes that the taxpayer has not satisfied its burden of persuasion as to non-taxability under the b test, or that the property in issue is taxable real property under the b test, then the court must determine whether the taxpayer has satisfied its burden of persuasion as to nontaxability under the a test.
The preceding formulation is consistent with the Supreme Court’s integration of the b and a tests, particularly its statements that the tests “do not present entirely separate hurdles to surmount before an item of personal property is taxable as real property,” and that “the b test was not designed to override the a test for the benefit of business interests.” General Motors Corp. v. Linden, supra, 150 N.J. at 536-37, 696 A.2d 683. Allocation of the burden of persuasion to the taxpayer as to non-taxability under the b test and assigning that test the limited function of creating a presumption that the requirements for non-taxability under the a test have been established, and then, if nontaxability under the b test is established, allocating to the municipality the burden of persuasion as to taxability under the a test, accomplishes two objectives: 1) it provides a meaningful role for the b test, but a role which does not override the a test, and 2) it gives appropriate recognition to the legislative policy and intent in enacting Chapter 117 and the BRA as described in detail by the Supreme Court and discussed above. Similarly, allocating to the taxpayer the burden of persuasion as to nontaxability under the a test when the taxpayer fails to establish nontaxability under the b test or when the b test categorizes the property in issue as taxable real property 1) provides a meaningful role for the b test, but a role which does not override the a test, and 2) is consistent with the legislative policy and intent in enacting Chapter 117 and the BRA. Under circumstances where property is taxable even under the b test (which was intended to expand the definition of nontaxa *268 ble business personal property), placing on the taxpayer the burden of persuasion as to nontaxability under the a test does not violate the legislative policy or intent underlying the BRA and preserves the traditional burden of a taxpayer seeking exemption from taxation to establish its entitlement to the exemption.
Allocating the burden of persuasion based on policy considerations is an accepted procedure. Although the law generally places the risk of non-persuasion on the party seeking to change the status quo, “important policy considerations may dictate that the risk should fall on the opposing party.” 2 McCormick on Evidence, supra § 336. These policy considerations also apply to the creation of presumptions.
[N]otions, usually implicit rather than expressed, of social and economic policy incline the courts to favor one contention by giving it the benefit of a presumption, and correspondingly to handicap the disfavored adversary ... Moreover, as is the case with initial allocations of the burdens, the reasons for creation of presumptions are often tied closely to the pertinent substantive law. This is particularly trae with regard to those presumptions which are created, at least in part, to further some social policy.
{Id. at § 343.]
See also id. at § 337, stating that the allocation of burdens of proof “either initially or ultimately, will depend upon the weight that is given to any one or more of several factors, including: (1) the natural tendency to place the burdens on the party desiring change, (2) special policy considerations such as those disfavoring certain defenses, (3) convenience, (4) fairness, and (5) the judicial estimate of the probabilities.”
Allocating the burden of persuasion as described above will require the taxpayer and, in a sense, the municipality to prove a negative. Specifically, the taxpayer will have to prove that a particular item of personal property is “neither a structure nor machinery, apparatus or equipment the primary purpose of which is to enable a structure to support, shelter, contain, enclose or house persons or property” under N.J.S.A. 54:4-lb, and the municipality will have to prove that a particular item does not satisfy the statutory standard of “not ordinarily intended to be affixed permanently” set forth in N.J.S.A. 54:4-la(3) (i.e., that permanent affixation is “ordinarily intended”). This is not a basis *269 for objection to the allocation. “Statements are found primarily in older cases to the effect that even though a party is required to plead a fact, it is not required to prove that fact if its averment is negative rather than affirmative in form. Such a rule would place an entirely undue emphasis on what is ordinarily purely a matter of choice of forms.” McCormick on Evidence, supra, § 337. Requiring a party to prove a negative is not unknown to the New Jersey courts. For example in Chase Manhattan Bank v. O’Connor, 82 N.J.Super. 382, 197 A.2d 706 (Ch.Div.1964), the court stated that, “[wjhere ... a party’s case depends upon the establishment of a negative, and the means of proof and fact are equally in the control of each party, the burden of proof is upon the party averring the negative.” Id. at 387, 197 A.2d 706. In Swain v. Neeld, 28 N.J. 60, 145 A.2d 320 (1958), the Supreme Court held that a taxpayer has the burden of proving that a gift was not in contemplation of death under N.J.S.A. 54:34-l(c).
Ill
Definitions
Deciding which items, if any, of the Manufacturing Property are subject to local property tax requires not only determination of the issues discussed above, but also clarification of the meaning of certain terminology appearing in N.J.S.A. 54:4-1.
The b test refers to “machinery, apparatus or equipment” which is defined in N.J.S.A. 54:4-1.15 as “any machine, device, mechanism, instrument, tool, tank or item of tangible personal property used or held for use in business.” The statutory definition of “used or held for use in business” is “any item of machinery, apparatus or equipment used or held for use in a business transaction, activity or occupation conducted for profit in New Jersey.” N.J.S.A. 54:4-1.15. These definitions are incorporated in regulations promulgated by the Director of the Division of Taxation. N.J.A.C. 18:12-10.1. Defendant does not dispute that the Manufacturing Property consists of machinery, apparatus, or equipment used or held for use in business as those terms are defined in N.J.S.A. 54:4-1.15, and, except as set forth below, *270 plaintiff does not dispute that the Manufacturing Property was affixed to real estate.
Defendant contends that the Manufacturing Property is taxable because (i) under the a test, no item of Manufacturing Property can be removed without material injury either to itself or to the realty, and all items were ordinarily intended to be affixed permanently, and (ii) under the b test, the paint spray and other booths, paint ovens, the make-up air units, and the stacker facilities constitute “structures.” Plaintiff asserts that all items of Manufacturing Property satisfy both the a and b tests for non-taxability, and also asserts that the make-up air units and storage tanks are not taxable because they are not affixed to the realty.
The meaning of the term “material injury” to the realty as used in N.J.S.A. 54:4-la(l) was considered in Chevron U.S.A., Inc. v. Perth Amboy, 9 N.J.Tax 205 (Tax 1987). There, the Tax Court, sitting en banc pursuant to R. 8:8-6, concluded that the statute refers to serious physical injury or damage. Id. at 233-41. Consistent with the Chevron U.S.A. decision, the Director of the Division of Taxation has defined material injury to real property as follows:
"Material injury” in the case of real property means serious physical damage to the real property. Some of the factors which can be considered in determining whether “serious physical damage” has occurred are any appreciable change in the market value of the real property as a result of removal; the amount of time and the cost required to repair the condition caused by removal; and the hazard or dislocation caused by the removal.
[N.J.A.C. 18:12-10.1.]
Defendant contends that an “appreciable change in the market value of the real property as a result of the removal” includes a change in the highest and best use of the subject property resulting from the removal of an item of Manufacturing Property. Thus, defendant argues that if, for example, a paint spray booth or section of conveyor is removed, the subject facility could no longer function as an automobile assembly plant, resulting in diminution of its highest and best use and a correspondingly lower value. Defendant concludes, therefore, that the removal would cause material injury to the real property, and, consequent *271 ly, paint spray booths and conveyors are taxable under N.J.S.A. 54:4-la. I reject this contention. The same impact on the highest and best use of the subject property would result if any item of equipment essential to the automobile assembly process were removed, even if that item was unquestionably personal property not subject to local property taxation (for example, hand-held pneumatic bolt tighteners). Defendant’s appraisal witness, who set forth the foregoing theory of material injury, conceded that material injury to the subject plant occurred for purposes of N.J.S.A. 54:4-1 only if the item of Manufacturing Property removed was real property. But the appraiser categorized the removed item of Manufacturing Property as taxable real property because of the impact of its removal. His analysis, therefore, is circular and does not define the term “material injury” as used in the statute.
Plaintiff, on the other hand, contends that the concept of material injury to the real property must be determined on a relative basis. For example, plaintiff acknowledges that the removal of a roof-mounted make-up air unit could result in a roof opening having dimensions of up to 180 feet long by 25 feet wide. Plaintiff contends that this does not constitute material injury to the realty because plaintiff is fully capable of restoring the roof and does so on a regular basis, and because an opening of 4,500 square feet represents a very small percentage of the total roof area which exceeds 1,000,000 square feet. The restoration required involves installing roof purlins (beams that support the roof), installing metal decking, installing reinforcing rods for concrete, pouring concrete, then installing a roof membrane. The roof structure, therefore, must be rebuilt.
Material injury is not a relative term based upon the size of the real property. One test for material injury is “the amount of time and the cost required to repair the condition caused by removal.” N.J.A.C. 18:12-10.1. Rebuilding the roof structure involves significant work, and that work is no less significant in the context of a 1,000,000 square foot roof than it would be in the context of a 10,000 square foot roof. The time and effort required *272 to make the repair must be viewed in itself and not in relation to the size of the overall structure.
A second element of the a test is whether the property can be removed without material injury to itself. In applying this test I will use the Director's definition as interpreted by the Supreme Court. The Director has defined this material injury as “physical damage to the personal property sufficient to destroy its utility.” N.J.A.C. 18:12-10.1. In R.C. Maxwell Co. v. Galloway Tp., 145 N.J. 547, 679 A.2d 141 (1996), where the issue was the taxability of billboards, the Supreme Court approved the narrow definition appearing in the regulation and held that material injury does not result when an item of property must be disassembled to be removed, even if the disassembled parts are not wholly reassembled.
We determine that Maxwell’s wooden billboards are not “irreparably” damaged on removal because certain support beams are not salvageable or that disassembly is required. Within the meaning and intendment of the statute, the billboards may be removed without material injury.
[Id. at 558, 679 A.2d 141.]
The court cited Chevron U.S.A., Inc. v. Perth Amboy, supra, 9 N.J. Tax 205, in support of its conclusion. R.C. Maxwell Co., supra at 557, 679 A.2d 141. There the Tax Court responded as follows to the municipality’s argument that piping and wiring would be lost in connection with the dismantling of refining structures:
However, aside from the undisputed fact that some piping and wiring would be destroyed for economic efficiency, defendant offers no proof that any piping or wing would be physically destroyed or injured by removal. To the contrary, we find that all of the piping and wiring could be removed without material, or serious physical injury.
[Chevron U.S.A., Inc. v. Perth Amboy, 9 N.J. Tax at 240-41.]
The third element of the a test requires a determination of whether the personal property in issue was “ordinarily intended to be affixed permanently to real property.” N.J.S.A. 54:4-la(3). In Chevron U.S.A., Inc. v. Perth Amboy, supra, the court discussed the meaning of “ordinarily intended,” in the context of Chapter 117. The BRA did not change the language of the intent test in Chapter 117.
*273 The use of the word “ordinarily” before the word “intended” [in N.J.S.A. 54:4— la(3)] shifts the focus of the inquiry from what is actually intended with respect to plaintiffs refinery, to what is “ordinarily intended” with respect to property like the refinery in question.
[W]e believe that, though not controlling, at least to the extent that they bear on the question of ordinary intent, outward appearances are a relevant consideration in applying c. 117.
[T]his court finds that a reasonable person examining the intricately connected mass of immense structures, piping, wiring, equipment and foundations [contained in Chevron’s refinery] would consider that machinery, equipment and process units like those in the photographs are ordinarily intended to be affixed permanently to real property.
Much consideration is given to the fact that, even after a close examination of all of the photographs, this court is unable to identify, and believes that a reasonable person would be unable to identify, any features designed or intended to facilitate the plant’s removal. Yet surely a reasonable person would agree that, if structures as massive, complex and cumbersome as found at Chevron’s refinery were not intended to remain permanently affixed to the realty, they would contain at least some features designed or intended to facilitate removal.
[Id. at 242-44.]
The “reasonable person” to whom Chevron U.S.A. refers was further described in NYT Cable TV v. Audubon Bor., 9 N.J.Tax 359 (Tax 1987), aff'd, 230 N.J.Super. 530, 553 A.2d 1368 (App.Div.), certif. denied, 117 N.J. 646, 569 A.2d 1344 (1989). There the Tax Court applied the “ordinarily intended” test in determining whether a cable television antenna tower was assessable as real property. The court used the objective standard articulated in Chevron U.S.A but clarified that the reasonable person to which Che'oron U.S.A. referred was a person in the industry in question. Thus, the court concluded that “a prudent cable TV company ordinarily would intend that the tower should remain in place as long as it could be used for cable TV purposes____"Id. at 369.
The Supreme Court adopted the reasonable person in the industry standard for determining ordinary intent in R.C. Maxwell Co. v. Galloway Tp., supra, 145 N.J. 547, 679 A.2d 141. After criticizing the Tax Court for failing to consider the “course of billboard industry practices,” the Court concluded that “[sjeveral pieces of evidence suggest that outdoor advertisers do not ordinarily intend their billboards to remain permanently in place.” Id. *274 at 560, 679 A.2d 141. In support of its conclusion, the Court relied on the regulation defining the phrase “not ordinarily intended to be affixed permanently to real property” which refers to the “custom and usage of the trade.” Id. at 561, 679 A.2d 141 (citing N.J.A.C. 18:12-10.1).
Based on the preceding discussion, in determining whether an item of Manufacturing Property was ordinarily intended to be affixed permanently to the real estate, I will apply the custom and usage in the automobile assembly industry, and will consider the perceptions of a person familiar with customary practices in that industry. I will also take into account the three “indicators” set forth in the Director’s regulation for determining whether personal property is ordinarily intended to be affixed permanently to real property. Those indicators are: 1) whether the personal property ordinarily would pass with title to the realty in the event of a sale; 2) whether the personal property ordinarily would be removed if the business were to relocate; and 3) whether similar items of personal property frequently are resold separate from and independent of the real property. N.J.A.C. 18:12-10.1. However, I will not treat these indicators as exclusive and will not regard any one or combination of them as decisive of the ordinary intent issue.
As stated above, I will address other definitional issues in connection with the discussion of particular items of Manufacturing Property. For example, the issue of what constitutes a “structure” within the meaning of N.J.S.A. 54:4-lb will be considered in my analysis of the paint spray and other booths, paint ovens and make-up air houses, and the issue of what constitutes the “point of connections [of piping] with the machinery, apparatus, or equipment of a production process” under N.J.S.A. 54:4-lb will be discussed in the context of the analysis of the piping.
IV
Booths and Ovens
During the years 1978 through 1985, the subject plant manufactured vehicles designated by plaintiff as the E-K Car model. This *275 model consisted of the Buick Riviera, Oldsmobile Toronado, and Cadillac Eldorado and Seville. In 1986, the plant was converted to manufacture the L Car model, consisting of the Chevrolet Corsica and Berretta. Manufacture of the L Car continued through 1992. From 1993 to the present, the plant has manufactured the ST Truck model, consisting of the Chevrolet S10 PickUp and Blazer, and the GMC Sonoma Pick-Up and Jimmy.
For each of the models, the assembly process included transit of each vehicle through paint booths and ovens and through additional booths in which functions other than painting were performed. In a paint booth, paint is sprayed onto the vehicle by machines, although, during the years the E-K Model was manufactured, some paint booths involved the use of machines and workers. Large volumes of temperature and humidity-controlled air are introduced into each paint booth to control excess paint spray. This air comes from a make-up air house (described in greater detail in Section V of this opinion) associated with the paint booth and located on the roof of the building. After being painted, the vehicle passes into an oven where the paint is baked and hardened. Other booths for which make-up air units were used included a powder booth, windshield primer booth, deadener booth, polishing booth, sanding booth, and repair booth.
The paint booths and these other booths were either 18 or 20 feet high, 15 or 25 feet wide (with one booth being 27 feet wide) and 30 feet to 300 feet in length. The ovens were 12 or 24 feet high, 15 feet wide, and 120 to 800 feet long, with one oven used for the E-K Car being 40 feet long.
Also in issue are booths which did not have associated make-up ah* houses. These booths were generally used for repairs. The solder grinding booth used for the E-K Car was 18 feet high, 15 feet wide and 175 feet long. The wire brush and panel spray booths used for the E-K Car had the same height and width as the solder grinding booth but were 60 and 25 feet long, respectively. The spot repair booths used for the ST Truck were 15 feet high, 12 feet wide and 30 feet long.
*276 In connection with the changeover of the plant from manufacturing the E-K Car to the L Car, many booths and ovens which pre-dated the E-K Car were removed because they were beyond them useful life, not required for manufacture of the L Car, or not suitable for the L Car painting process. All booths and ovens removed from the plant were demolished and scrapped. Booths also were removed in connection with the changeover from the L Car to the ST Truck, and were demolished and scrapped. For each vehicle model, some booths and ovens installed for the previous model were modified, including, in a few instances, shortening or lengthening. No booth or oven, however, was relocated in its entirety within the subject plant. In connection with the changeover from the E-K Car to the L Car, one oven was taken out of service but remained in place and functioned as a conveyor way. A second oven used for the E-K Car and L Car remained in place for the ST Truck, but served only as a conveyor way.
The construction of each booth served by a make-up air unit generally includes the following features. Below the booth is a structural steel framework 36 inches to 42 inches high. This framework is bolted and welded together and sits on a floor pan. The floor pan consists of steel segments, 20 feet wide and 10 feet long which are generally welded (but sometimes bolted) together. The floor pan is bolted to the concrete floor of the plant using lag bolts embedded in the concrete floor. The floor pan is attached to the bolts and then appropriate nuts are tightened on the bolts. The walls of the booth consist of ten feet long sheet metal sections, that are bolted to the steel framework. Each wall section has a flange at each end, and the sections are bolted together through the flanges. A steel grating installed over the steel framework structure serves as a floor for the booth. A conveyor installed in this floor transports vehicles through the booth. A steel support structure is installed slightly below the tops of the walls. This structure holds filters or perforated steel sheets used in the operation of the booth. Immediately above the walls of the booth is a sheet metal plenum having the same length and width as the booth itself, and extending eight to ten feet high. The plenum is *277 welded or bolted to the perimeter walls of the booth and is connected to an opening in the roof by bolting or welding. The connection to the roof is then sealed. As discussed below, a makeup air house is installed above the plenum and pumps high volumes of air into the plenum which is then distributed into the booth.
Utility systems are installed in the booth. These systems include electrical connections, fire sensors, a sprinkler system, compressed air lines, and water lines. The booth is also connected to an exhaust system consisting of one or more ducts which are welded together. These ducts are attached to a stack or stacks penetrating the roof.
Adjoining most of the booths is a control room which has diamond plate steel flooring welded together. The control room uses the exterior of the booth as one wall. Its other walls are sheet metal which are zip screwed to an iron or steel frame member used to support the walls. The control room has a false ceiling and contains the various controls used to operate the machinery inside the booth. The control room is located on a steel platform. The components of the platform and the stairways providing access are welded together and bolted to the plant floor.
Booths used for painting have a water system which precipitates excess paint spray from the air. The cleaned air is exhausted through the roof. The water-paint mixture (sludge) is collected in the floor pan and then piped to a treatment facility. The deaden-er booth, powder spray booth, windshield primer booth and sanding booths are dry booths, and do not have this water precipitating system.
The booths without associated make-up air houses are constructed in a manner similar to the preceding description. They are bolted to the floor, have sheet metal walls attached to structural steel, and utility connections. These booths do not have control rooms.
The ovens have walls consisting of insulated panels generally ten feet in length attached to a structural steel frame bolted to the *278 concrete floor of the plant. The panels connect in a tongue-in-groove fashion and are screwed together. Duct work and heater units are installed above the ovens, and the duct work penetrates the roof. Welded steel platforms and stairways are located outside the ovens and bolted to the plant floor.
The evidence demonstrates that the booths and ovens, including control rooms and platforms, were affixed to the plant building. As a result, the booths and ovens are presumptively taxable. In support of its contention that neither the booths nor the ovens are subject to tax, plaintiff asserts the following with respect to the b test of N.J.S.A. 54:4-1: (1) the booths and ovens are machinery, apparatus, or equipment used in the plant’s production process, (2) the primary purpose of the booths is to enclose paint spray, powder, other particulates, and fumes and prevent them from dispersing throughout the plant, and (3) the primary purpose of the ovens is to confine and concentrate heat. Defendant responds that the booths, ovens, and control booths constitute structures within the meaning of the b test.
The term 'structure’ is defined in the BRA as “any assemblage of building or construction materials fixed in place for the primary purpose of supporting, sheltering, containing, enclosing or housing persons or property.” N.J.S.A. 54:4-1.15. This definition, with the omission of the words “or housing,” is incorporated in N.J.A.C. 18:12-10.1, which also provides that “[t]he term structure does not include machinery, apparatus or equipment which the structure is designed to hold in place, shelter, contain or enclose.” N.J.A.C. 18:12-10.1. In Texas Eastern Transmission Corp. v. Department of the Treasury, Div. of Taxation, 11 N.J.Tax 198 (Tax 1990), the Tax Court concluded that a mainline gas pipeline, which the plaintiff conceded was real property, “must therefore be a structure because it encloses property, namely, the gas which it encloses, moves and stores.” Id. at 210. This decision pre-dated enactment of the BRA and interpreted Chapter 117 and regulations relating to Chapter 117. The decision includes a finding by the court that, in enacting Chapter 117, the Legislature intended “to broaden the definition of real property and narrow the definí *279 tion of personal property.” Id. at 211. As discussed above, the Supreme Court held in General Motors Corp. v. Linden, 150 N.J. 522, 530-31, 696 A.2d 683 (1997) that, in enacting the BRA (partly in response to certain Tax Court decisions including Texas Eastern Transmission Corp.), the Legislature intended to broaden the definition of personal property to the maximum extent constitutionally permissible. See also the discussion of legislative intent in Emmis Broad. Corp. of N.Y. v. East Rutherford Bor., 14 N.J.Tax 524, 531-32 (Tax 1995), aff'd, 16 N.J.Tax 29 (App.Div.), certif. denied, 147 N.J. 263, 686 A.2d 764 (1996).
The BRA and the Supreme Court’s General Motors Corp. opinion must be considered in interpreting the term “structure” as defined in N.J.S.A 54:4-1.15 and as used in N.J.S.A 54:4-lb. I conclude that the primary purpose of the booths and ovens at issue is to contain or enclose manufacturing processes and not persons or property. The machinery and equipment inside the booths and ovens could operate without the booths. The primary purpose of the booths is to prevent the dispersion throughout the plant of paint, powder, other particulates, and fumes, and the primary purpose of the ovens is to contain or enclose heat. The control booths could be deemed to contain, enclose, and shelter persons and property, but they are ancillary, integral and integrated parts of the booths and ovens. As noted above, one wall of a control room is the wall of a booth (and, for a control booth between and serving two booths, two of the control room walls are booth walls). The control rooms, therefore, should not be treated as separate structures under the statute and do not lose their identity as machinery, apparatus or equipment under the b test. References below to the booths and ovens include any associated control rooms.
Based on the preceding analysis, I conclude that plaintiff has established that the booths and ovens described above are “machinery, apparatus, or equipment used or held for use in business” as such terminology is used in N.J.S.A 54:4-lb. As a result, plaintiff has overcome the presumption of taxability resulting from *280 affixation, and has created a presumption that the elements of the a test in N.J.S.A. 54:4-1 have been satisfied.
Both plaintiff and defendant presented proofs as to the a test. Based on those proofs, I conclude that the booths and ovens can be removed from the plant without material injury to the real property. The booths and ovens can be disassembled on site. The disassembled sections may be sufficiently large that removal through an opening in the wall of the building is required. This does not constitute material injury to the real estate because removable panels in the building wall can and do accommodate installation or removal of large equipment without any damage to the real property.
I further conclude that the booths and ovens can be removed without material injury to themselves. I am satisfied from the testimony that the installation process can successfully be reversed, with the utilities uninstalled, the sections of the booths or ovens separated from each other and the welded floor cut apart with oxyacetylene torches. The booths and ovens could be reassembled elsewhere. Platforms and stairways also could be cut apart and reassembled. If some utility lines from a booth or oven are not reusable, this does not result in material injury. See R.C. Maxwell Co. v. Galloway Tp., supra, 145 N.J. at 558, 679 A.2d 141. Cutting the floor pans would not preclude rewelding, because the edges of the floor plate could be ground smooth and rewelded as necessary.
Plaintiff established that, in connection with the closure of its Framingham, Massachusetts plant, paint booths and ovens were disassembled and shipped to a new plant in Silao, Mexico where they were reassembled and used in the production process. From that experience, I conclude that material injury to the personal property is not an inevitable result of the removal of the booths and ovens.
The third element of the a test is whether the personal property “is not ordinarily intended to be affixed permanently to real property.” As discussed above, the applicable' standard in *281 applying this element is whether industry custom treats the item of equipment as permanently affixed. Evidence that removal and relocation of booths and ovens is possible without material injury to the real estate or to the booths and ovens does not satisfy the intent element of the a test. See Westinghouse Broad. Co. v. Director, Div. of Taxation, 141 N.J.Super. 301, 306-08, 358 A.2d 203 (App.Div.1976) (concluding, under prior law, that even if structures can be removed without material injury to the land, the structures may be intended to be affixed permanently). This evidence, including plaintiffs experience at its Framingham, Massachusetts plant, is insufficient to outweigh the significant and substantial other evidence that booths and ovens, once installed, customarily are not moved or relocated, and, when they are removed, they customarily are demolished and scrapped.
In the subject plant itself, no booth or oven was ever relocated and reused except for one very small paint booth having dimensions of five feet by ten feet. When new model lines were brought into the plant, if booths or ovens from the previous model interfered with, or were unnecessary for, the production line for the new model, those booths or ovens were removed, demolished and scrapped, or simply left standing to function as conveyor ways. When plaintiff required additional booths or ovens for a new vehicle model, plaintiff purchased new booths or ovens. The person in charge of removal and redistribution of used equipment for plaintiff testified that “[njormally a paint booth when it’s put in a location, it will stay there for either its life or if there is a technology change that would require a better grade of spray booth, then it would be installed there.” The plant engineering manager at the subject property testified that, a paint oven “doesn’t move real well in one piece.”
The proofs demonstrated that most ovens installed in 1978 were still used in the year 2000 with changes being made in control technology and environmental contamination abatement technology. Although plaintiff lengthened one paint booth by removing the end piece and adding panels, the main booth itself remained in *282 the same location. Car models changed, painting methods changed, but the ovens remained.
With the exception of the Framingham, Massachusetts experience, plaintiff presented no evidence of regular or ordinary relocation of booths or ovens of significant size in the subject plant or elsewhere. Of the twenty-nine assembly plants closed by plaintiff during the period 1983 through 1998, the only booth relocations occurred at plaintiffs Wentzville plant where a car wash booth, the platform of a small paint booth, and one other small booth were moved. During the same period there was no instance in which an oven was relocated. All other ovens or booths which were removed were demolished and scrapped.
The rarity of the relocation of a booth or oven is the result of a variety of factors. As described by one of plaintiffs expert witnesses, in order for the removal and re-use of a paint booth or paint oven to take place, “I would kind of almost make it akin to, if you will, an aligning of the planets in some regards.” This expert testified that, in order for a booth or oven to be relocated to another plant, the booth or oven must have current technology, must be fairly new, and the other plant must have a corresponding need for the same kind of system. Plaintiffs employee in charge of the removal and redistribution of used equipment testified that the relocation of paint booths and ovens from Framingham to Mexico was possible because the following factors coalesced: the Framingham equipment was new and had been underutilized (somewhat over two years old and used for only one shift when it was designed for two shifts), technology in the booths and ovens was current, the booths and ovens were no longer needed in Framingham, and the Mexico plant needed the booths and ovens at the time the Framingham plant was closing.
In those circumstances where plaintiff did not close a plant but merely retooled for a different vehicle model, booths and ovens were not relocated within a plant or to another facility of plaintiff, nor were they placed on the secondary market for sale. I am satisfied from the evidence that no market exists for such equipment. It may be customary for the equipment to be removed in *283 connection with the sale of an automobile assembly plant. However, although removal indicates that the equipment is not essential to operate the building, removal demonstrates that the equipment is not intended to be affixed permanently only if the removal results in the reuse of the equipment. Here, the evidence demonstrated that whenever booths and ovens were removed they were demolished and scrapped (with the limited exceptions discussed above). No effort was made to resell or reuse them.
In summary, the evidence demonstrates that booths and ovens are disassembled and relocated only under very unusual and limited circumstances. The infrequency with which those circumstances occur is demonstrated by the history of plaintiff s practices as described above. Based on those practices and the substantial evidence summarized above, I conclude that a person familiar with customary practices in the automobile assembly industry would conclude that booths and ovens, including control booths, support structures, platforms, and stairways, are ordinarily intended to be affixed permanently, and therefore, are taxable under the a test. The mere fact that these massive, cumbersome items of equipment can be moved does not demonstrate that they are ordinarily intended to be moved and, therefore, are not taxable under N.J.S.A. 54:4-la. A residential house can be moved, but that fact, in itself, does not demonstrate that the house is not ordinarily intended to be affixed permanently or is not taxable as real property.
V
Make-Up Air Houses
As set forth in the discussion of booths and ovens, certain booths at the subject plant have associated make-up air houses located above them. With the exception of the make-up air house for the grinder booth used during the manufacture of the L-Car model, which was located in and attached to the truss work of the building, all of the make-up air houses in issue are or were located on the roof of the building. The make-up air houses have metal walls and roofing, and each house has exterior dimensions generally equivalent to the dimensions of the booth to which it is *284 connected. The make-up air house is usually somewhat wider than the booth because of the inclusion of a corridor in which controls are located. The make-up air houses range in height from 18 to 20 feet, in length from 30 to 235 feet, and in width from 15 to 25 feet. These widths do not include the control corridors which add approximately 10 feet in width. The function of the make-up air houses is to supply large volumes of temperature-controlled and humidified air to control paint overspray and fumes in paint booths and to control other particulates and fumes in other booths.
A make-up air house usually comprises multiple zones with each zone containing the equipment necessary to treat the air used in the zone. Each zone has one or more fan units which blow air at high volumes into a plenum (a large sheet metal box described above) which connects the make-up air house with the booth below it. The zones, and thus the make-up air houses, are constructed in sections ten to twenty feet in length, and having height and width dimensions appropriate for the house. A zone generally requires four or five sections. Each section, including its equipment, is prefabricated by the manufacturer and delivered to the plant generally as a rectangular box with sheet metal walls, roofing and the equipment installed. The sections are transported to the plant by truck and then lifted to the roof of the building by helicopter. The equipment in each section is either heating or humidification units, filter frames to remove particles of dirt, or fans. The sections are assembled by zone and then the zones are joined together to form the make-up ah- house. The sections are generally joined together with nuts and bolts installed in flanges, and, in most cases, no welding is involved. Exterior siding, if not included in the prefabricated section, is then installed, sometimes with insulation. Doors in the house walls provide access for plant personnel.
To accommodate the installation of a roof-mounted make-up air house, a metal curb is installed on the roof. The curb has the same dimensions as the perimeter of the make-up air house. Roofing is flashed to the curb so that, when the make-up air house *285 is installed over the curb, there will be no leakage into the building. The make-up air house is lag-bolted to the curb.[6] Roof openings generally ten feet by twenty feet are made to accommodate the fan section of each zone. If, therefore, a make-up air house has seven zones, with seven fan units, the aggregate size of the holes in the roof will be fourteen hundred square feet (10 feet x 20 feet x 7). In certain instances, such as the make-up air house for the powder booth used in the manufacture of the ST Truck model (having dimensions of 27 feet in width and 120 feet in length), the roof opening to accommodate the make-up air house is the same size as the house itself.
Utility lines and piping for electricity, natural gas, steam, compressed air, fire sprinklers and water are installed as necessary for each zone of the make-up air house.
The construction of the make-up air houses in dispute is similar to that of air supply houses located on the roof of the building which provide ambient air for the plant. Plaintiff acknowledged that these air supply houses are subject to property tax. The air supply houses operate at much lower volumes than the make-up air houses, and are generally smaller than the make-up air houses. The make-up ah* houses provide air volumes generally in excess of 100,000 cubic feet per minute, but ranging from 32,400 cubic feet per minute to 506,000 cubic feet per minute. Make-up air houses providing air at lower volumes, ranging up to 60,000 to 87,000 cubic feet per minute, can be and, in at least two instances have been, converted into supply houses for ambient air in the plant when they were no longer needed for the operation of a booth.
Each of the make-up air houses could be disassembled and removed from the roof by simply reversing the installation process. Utility lines would be disconnected, the sections would be unbolted, and each section would be lifted by helicopter from the roof to the ground. Removal of the make-up air house would leave a roof opening either the full size of the house (less the *286 control corridor area) or several openings having dimensions of ten feet by twenty feet where the fan units were located. In its Framingham, Massachusetts plant, plaintiff removed make-up air houses from the roof of the plant and shipped them to Silao, Mexico. However, at the subject plant no make-up air house has ever been removed and relocated. When a make-up air house has been removed because the use of a booth was discontinued or because the house had reached the end of its useful life, the booth was scrapped. A major reason for this procedure relates to downtime. Each minute of lost production is very expensive for an automobile assembly plant. Disassembling and relocating a makeup air house requires more time, and, therefore, more down-time in production, than simply leaving the house in place or disassembling it with oxyacetylene torches, removing the house from the roof, and installing a new make-up ah’ house where needed. In its closure of automobile assembly plants, other than Framingham, Massachusetts, plaintiff has not removed and relocated make-up air houses. The houses were generally left in place or removed and scrapped in connection with the shut-down or sale of the plant. The same procedure was followed in connection with model changeovers, that is, make-up air houses were not removed and relocated. The unneeded houses were left in place or removed and scrapped, and new houses were installed as and where required.
Based on the preceding description, I conclude that the make-up air houses are affixed to the subject building and, therefore, are presumptively subject to property tax. Plaintiff contends that the make-up air houses are not taxable under the b test of N.J.S.A. 54:4-1 because: 1) the make-up air houses are machinery, apparatus or equipment used in the production process, and 2) the primary purpose of the houses is to provide conditioned air for the production process. Defendant responds that the make-up air houses are structures, in some cases as large as buildings, and that the primary purpose of the make-up air houses is to enable the subject building to support or enclose persons or property. With respect to this argument, defendant relies on evidence that each make-up air house assists in the containment of paint spray, *287 other particulates, and fumes, and, therefore, assists in providing an appropriate environment for the workers in the plant, particularly improving the quality of the breathable air. Defendant also notes that, with respect to the paint booths used during the E-K Car model, where workers as well as machinery were used to apply paint, the make-up air houses had a very direct role in enabling the building to support and enclose the workers.
As in the case of the booths and ovens, both parties presented evidence as to the a test as well as the b test. Their arguments as to the a test are similar to those made with respect to the booths and ovens. Plaintiff contends that, as demonstrated by the Framingham, Massachusetts experience, make-up air houses can be, and are, disassembled and relocated without material injury to the real estate or to themselves. Plaintiff further contends that the Framingham experience demonstrates that the make-up air houses are not ordinarily intended to be affixed permanently. Defendant characterizes the Framingham experience as unique and not representative of the general practices of plaintiff or the automobile assembly industry. Defendant contends that the general practice for plaintiff and the industry is that make-up air houses are not removed and relocated but are left in place or removed and scrapped when no longer needed for the production process, and, therefore, make-up air houses are ordinarily intended to be affixed permanently. In this regard, defendant notes that, in connection with the sale of many of plaintiffs plants, the make-up air houses were not removed and were acquired by the purchaser of the plant. Defendant further contends that: 1) removal of the make-up air houses causes material injury to the real estate because of the roof rebuilding required to close the roof openings, and 2) there is no secondary market for make-up air houses or any of their components.
In applying the a and b tests in accordance with the discussions in Sections II and III of this opinion, I conclude that the make-up air houses are not taxable under the b test of N.J.S.A. 54:4-1, but the houses, including the equipment installed by the manufacturers before delivery of sections of the houses, are taxable under the a test. Although the houses are affixed to the real property, they are not “structures,” and thus are not taxable under the b test. *288 As discussed in Section IV above, “structure” is defined in N.J.S.A. 54:4-1.15 as “any assemblage of building or construction materials fixed in place for the primary purpose of supporting, sheltering, containing, enclosing or housing persons or property.” See also N.J.A.C. 18:12-10.1 (containing a similar definition). The houses are machinery, apparatus or equipment. Their primary purpose is not to enable a structure to support, shelter, contain, enclose or house persons or property. The make-up ah’ houses assist in providing breathable ah’ for workers in the plant, but the primary purpose of the houses is to provide high volumes of ah* as part of the production process.
The make-up air houses are taxable under the a test because they cannot be removed without material injury to the real property, and because the houses are ordinarily intended to be affixed permanently. Removal of a make-up ah' house results in material injury to the real property in the form of significant holes in the roof. As discussed in Section III of this opinion, material injury is to be measured not by the size of the roof opening as compared to the overall dimensions of the roof, but by the nature and extent of the work required to repair a roof opening. As described above, that work involves essentially a rebuilding of roof area ranging from 200 to 4,500 square feet.
The general practice and intention in the automobile industry is that, once a make-up ah’ house is installed, it is to remain in place until no longer useful for the manufacturing process. It is then removed and scrapped. Therefore, the make-up ah’ houses are ordinarily intended to be affixed permanently. Plaintiffs relocation of make-up air houses from Framingham, Massachusetts to Silao, Mexico is not typical or representative of the usual practices of plaintiff or the automobile assembly industry.
VI
Conveyors
The subject building contains approximately 65,000 linear feet of conveyors, carrying vehicles and vehicle parts along the produc *289 tion line at a speed appropriate for production of forty-five vehicles per hour. The conveyors are divided into two basic categories: overhead conveyors and floor-mounted conveyors. The overhead conveyors category comprises two types — (1) overhead power and free and (2) monorail conveyors. The floor-mounted conveyors category comprises four types — (1) inverted power and free, (2) flat top, (3) twin strand, and (4) chain-on-edge conveyors.
All types of conveyors are delivered to the plant in sections. The sections are generally twenty feet long, but can range in length from ten feet to forty feet. Each section, regardless of the type of conveyor, includes a chain mechanism which causes either a vehicle or a transport containing a vehicle or vehicle part to move along the conveyor. Steel rails or other forms of enclosure, contain and support the chain mechanism and other equipment [such as a drive mechanisms, take-up mechanisms (which maintain tension in the chain), and sprockets] necessary for operation of the conveyor. The chain mechanism and related equipment are not in dispute; defendant acknowledges that those items constitute personal property not includible in plaintiffs tax assessment.
A. Overhead Conveyors
Overhead power and free conveyors are installed by placing clamps on roof purlins (a purlin is a steel beam supporting the roof) and using bolts to tighten the clamps. The bolts do not penetrate the purlins because penetration could compromise the purlins’ structural integrity. Attached to each clamp is a piece of steel called a hanger, which extends downward from the clamp. Two clamps and hangers are required at each support point for an overhead power and free conveyor. The pieces of hanger steel vary in length depending upon the height at which the conveyor is to function in the production process. Attached to the ends of the two pieces of hanger steel is a horizontal piece of header steel. The hanger and header steel are sometimes referred to together as header steel. The sections of conveyor rail (usually twenty feet in length), that is, the portions of the conveyor that support and enclose the chain and mechanism of the conveyor, are welded *290 together, end-to-end at the plant and then bolted to the header steel.
Sections of overhead power and free conveyors are shipped by the manufacturer in separate components, namely, the conveyor rail, the header steel, the drive mechanisms, take-up mechanisms, and other components. For some conveyors, a steel mesh guard is included. This is installed under the conveyor rail to prevent vehicle parts from falling on the personnel working below.
Monorail conveyors are installed in a manner similar to the overhead power and free conveyors, except that the conveyor rail consists of an I-beam rather than the special proprietary rail design used for overhead power and free conveyors.
B. Floor-Mounted Conveyors
Of the four types of floor-mounted conveyors, three — the twin strand conveyor, chain-on-edge conveyor, and inverted power and free conveyor — consist essentially of steel rails attached to the floor by lag bolts, although some inverted power and free conveyors are lag-bolted in shallow pits in the floor. Lag bolts, as described above, are bolts installed into the concrete floor with an end protruding to which the conveyor rail is attached, and then a nut is placed on the bolt and tightened. The types of rail and types of the transports (the devices holding the vehicle or vehicle part as it moves on the conveyor) may differ among the three conveyor types. Power roll and roller flight conveyors transfer vehicles from one floor-mounted conveyor to another. These conveyors are similar to the twin-strand and chain-on-edge conveyors, and will be treated similarly.
The fourth type of floormounted conveyor is the flat top convey- or. This conveyor differs significantly from the others in its manner of installation. Flat top conveyors are installed in pits dug into the concrete floor of the plant. The pits are generally four to five feet deep and eight feet wide, although, in some instances, two parallel pits are dug, each approximately the width of the conveyor track described below. In some of the wide pits, personnel work under vehicles being transported on the conveyor. *291 In order to create the pit, the concrete floor is saw cut or jack-hammered. The floor is then excavated and a new concrete floor is installed at the bottom of the pit. Cinder block walls for the pit are then constructed. A steel structure, welded or bolted together, is installed in the pit and lag-bolted to the pit floor. The steel structure supports two parallel conveyor tracks on which vehicles move. The tracks are spaced to match the width of the vehicles. Diamond plate steel flooring is installed on the support structure between the tracks.
C. Automatic Guided Vehicle
Another, and entirely different, type of conveying device is the automatic guided vehicle (AGV). This consists of wires installed in slots cut into the concrete floor of the building. These wires function as part of the production line. Therefore, their taxability is not controlled by the statement in General Motors v. Linden, supra, 150 N.J. 522, 696 A.2d 683, that, “[ejleetrical wire embedded in the floor would be classified as real property.” Id. at 538, 696 A.2d 683. As the Court explained, when the electrical wire reaches the production line, “it is classified as business personal property.” Ibid.
After the wire is installed, the slots are re-filled with concrete. Sensor devices on wheeled carriers cause the carriers to follow the route dictated by the location of the wires in the floor.
D. Analysis
Based on the preceding description, I conclude that all of the conveyors and the AGV are affixed to the subject building, and, therefore, are presumptively subject to real property tax. Plaintiff contends that the conveyor systems and the AGV are not taxable because they are machinery, apparatus, or equipment used in the production process. Defendant responds that: (1) removal of any of the conveyor systems, which is normally done by using oxyacetylene torches, causes material injury to the conveyors themselves, (2) with respect to the flat top conveyor and AGV, removal will cause material injury to the real estate, and (3) all of *292 the conveying systems are ordinarily intended to be affixed permanently.
Both parties presented evidence as to the b test and a test contained in N.J.S.A. 54:4-1. With respect to the b test, I conclude that the conveyor systems are machinery, apparatus, or equipment used in the production process, and they are not structures within the meaning of that term as defined in N.J.S.A. 54:4-1.15. Accordingly, the conveyors and AGV are not taxable under the b test, and defendant has the burden of persuasion to establish taxability under the a test. For the reasons set forth below, I conclude that the overhead conveyors (including steel mesh guards and the beams used to support the conveyor chain when it returns to the beginning of its loop), and the floor-mounted conveyors other than the flat top conveyors are not taxable under the a test. I conclude that the flat top conveyors are taxable because removal causes material injury to the real estate. I further conclude that the hanger and header steel used for the overhead conveyors is taxable, and that the AGV is not taxable.
The evidence demonstrates that all of the conveyor systems can be, and have been, disassembled and moved without material injury to themselves or to the header steel. The disassembly process generally involves the use of oxyacetylene torches to separate conveyor sections, remove bolts from clamps, remove bolts from header steel, and cut lag bolts. The use of torches rather than mechanical devices to loosen bolts is dictated by time considerations. Using the torches is much quicker and more efficient than loosening and removing the bolts, and thus minimizes production down-time. The torch cutting does not preclude the re-use of the removed conveyor sections. The ends of the sections can be, and have been, ground to a smooth finish, making the sections suitable for re-welding and re-installation in a new location within the plant. This is standard procedure in the automobile assembly industry.
*293 The evidence also demonstrates that, with the exception of the flat top conveyors, all conveyor types can be removed without material injury to the real estate. The method for removing overhead conveyors described above causes no damage to the real estate. The floor-mounted conveyors and the support steel for flat top conveyors are generally attached to the floor by lag bolts. Removal of these conveyor systems involves simply unbolting them, or the support steel, either mechanically or through the use of torches. The lag bolts can remain for re-use, or be cut to floor level. Removal of the bolts from the concrete is not essential.
The remaining issue under the a test is whether conveyors are ordinarily intended to be affixed permanently. As to this issue, the evidence demonstrates that, although the relocation of a large section of any one of the conveyor systems rarely occurs (one occurrence was in connection with the closing of plaintiffs Framingham, Massachusetts plant discussed above) and removed sections of conveyors are often scrapped, the removal, relocation, and re-use of smaller sections of each type of conveyor system is a regular and normal occurrence in the subject plant and in the automobile assembly industry. Relocation and re-use occurs in connection with the fine-tuning of the production process or in connection with model changeovers. The selection of which portion of a conveyor may be removed and relocated is not a function of the nature of the conveyor system itself or its method of attachment to the building. Selection of the portion to be moved relates to the needs of the production process. Therefore, any section of a conveyor could be removed and relocated. Whether a conveyor section is re-used is a function of the remaining physical life of the section, the technical requirements of the new installation, and economics. Conveyor sections which have reached the end of their economic life-span or which will not fit into a revised production line are scrapped.
The following are examples of the removal, relocation, and reuse of conveyor sections at the subject plant:
*294 1. when overhead power and free conveyors have been shortened, the removed section has been reinstalled to lengthen another portion of the overhead power and free conveyor system;
2. in connection with the model changeover from the L-Car to the ST Truck, the engine line monorail conveyor was shortened by 500 to 600 feet, and the removed sections were relocated and reattached to another section of monorail conveyor;
3. a twin strand conveyor was lengthened by cutting the end off the conveyor, moving the end section to a new location, and inserting a new section of conveyor;
4. a chain-on-edge conveyor was shortened and the removed section was moved and reattached at another location;
5. power-roll conveyors installed at the end of a chain-on-edge or twin strand conveyor have been unbolted from the floor and reinstalled at other locations;
6. a roller flight conveyor was relocated approximately 1,000 feet.
Based on the foregoing discussion, I conclude that, because sections of all types of conveyors can be, have been, and normally are removed and relocated, the conveyors are not ordinarily intended to be affixed permanently. Accordingly, with the exception of the flat top conveyors discussed below, the conveyors are not taxable under the a test. My conclusion as to non-taxability also applies to the beams used to support the conveyor chain in overhead conveyors when the chain returns to its beginning point as part of a loop arrangement. Defendant presented no evidence as to the nature of the installation or the methodology for removal of these support beams, and presented no evidence to demonstrate that the beams are not moved with the conveyor systems.
My conclusion as to nontaxability, however, does not apply to the header steel, hanger steel, and clamps attached to the roof purlins. As discussed above, the header steel (including hangers and clamps) used for installation of the overhead conveyors can be removed without material injury to the steel or to the real estate. *295 Cutting the bolts used to attach header steel can be done so that the steel can be reused. Such re-use, however, is unlikely for two reasons. One reason is that the header steel is configured for installation of a conveyor at a specific height above the floor. A new location may have different height requirements, and the header steel is not adaptable. Plaintiffs expert testified that, in general, no effort is made to salvage the hanger and header steel “because it’s specific to the physical configuration, the actual height that you want in the workplace and everything else.” A second reason is economics. In this regard, plaintiffs expert testified that it was cheaper to replace the hanger and header steel than to remove and relocate it. He stated that hanger and header steel “are relatively low value items thus the economics for trying to save them are not real good.” Based on the preceding discussion, I conclude that the header steel (including hangers and clamps) is ordinarily intended to be affixed permanently, and, therefore, is taxable under the a test.
As noted above, flat top conveyors must be treated differently from the other types of conveyors. The removal of a flat top conveyor from its pit causes material injury to the real estate because of the nature of the repair required as a result of the removal. When the conveyor is removed, a steel plate can be installed over the pit opening if there will be no forklift or other heavy traffic in the area. This, however, is not a permanent repair, and is analogous to installing a heavy tarpaulin over a hole in the roof remaining after removal of a make-up air house. In order to repair the pit, holes are punched in the concrete floor of the pit, the pit is then filled with sand, steel reinforcing bars are installed and tied into the existing floor slabs on all sides of the pit, and then four inches of concrete slab are poured to restore the floor to its original condition. This restoration involves essentially a reconstruction of the floor in the area of the pit. As a result the removal of a flat top conveyor results in material injury to the real estate under the definition of such injury discussed in Part III of this Opinion, and flat top conveyors are taxable under the a test.
*296 As to inverted power and free conveyors installed in pits, defendant did not provide any evidence as to the size or depth of the pits, the installation technique, the process for removal of a conveyor so installed, or the nature and extent of the repairs to the realty required after removal. Accordingly, I conclude that any portions of inverted power and free conveyors installed in pits at the plant are not subject to taxation under the a test.
The AGV wires are installed in small recesses cut in the concrete floor. These recesses are approximately two inches deep and wide. After installation of the wires, the recesses are refilled with concrete. Defendant has failed to demonstrate that the removal of the AGV wires will cause any material injury to the wires. Removal requires breaking up the concrete and refilling the small recess or slot. This does not constitute a major repair, and, therefore, the removal of AGV wires would not cause material injury to the real estate. Defendant has further failed to demonstrate that, once the AGV wires are installed, they are not regularly removed and relocated. Therefore, defendant has failed to demonstrate that the wires are ordinarily intended to be affixed permanently. Consequently, I conclude that the AGV is nontaxable under the a test.
VII
Process Piping
The subject plant contains miles of process piping divided into a number of systems, each of which performs a specific function. The piping systems in dispute consist of the following: sludge treatment; process waste removal; steam and condensate; compressed ah'; weld water; deionized water; chassis fluids; and paint circulating. These systems perform the following functions. The sludge treatment piping carnes water to each paint booth in the plant. The water is used to precipitate excess paint spray from the air. The mixture of paint and water, referred to as sludge, flows to a tank under the booth and then through the second portion of the sludge treatment piping to a treatment *297 plant. The process waste removal piping collects waste products from various points along the production line and transports the waste to a treatment plant. The steam and condensate pipes perform related functions. The steam pipes carry steam to the locations in the production process where heating is required. After the steam performs its heating function, it condenses, and the condensate pipes capture the condensed steam (water) and transport it back for reheating. The compressed air pipes carry compressed air from a compressor to the various locations on the production line. Weld water pipes carry cooled water to the robotic welders used in the production process. After cooling the welders, the weld water is piped, via a separate part of the system, to a cooling tower and storage tank from which the water recirculates. Deionized water pipes transport specially treated water used in the painting process. Chassis fluid pipes transport, from storage tanks to the production line, the various fluids required for operation of a vehicle. These fluids, including items such as anti-freeze and engine oil, are installed towards the end of the production process. Paint circulating pipes carry paint from storage tanks into the paint booths where the paint is distributed to spray equipment.
All of the pipe systems are constructed in basically the same manner. Each system consists of a main and, sometimes, sub-mains, and feeder pipes. The feeder pipes connect a main or a sub-main to specific pieces of production machinery, apparatus, or equipment or to specific locations along the production line. Mains and sub-mains are installed on pipe racks or hangers which are attached to the building. The mains and sub-mains range in diameter from one and one half inches (chassis fluid pipes) to twenty-four inches (sludge treatment pipes). Feeder pipes range in diameter from one-half inch (paint circulating pipes) to twenty inches (sludge treatment pipes). In general, feeder pipes have diminishing diameters as they progress from a main or sub-main to a specific piece of machinery, apparatus, or equipment or a specific location on the production line. The diminution in diameter is intended to maintain pressure and the rate of flow in the pipes.
*298 Main and sub-main piping is delivered to the plant in lengths of twenty or twenty-one feet, which generally are welded together end-to-end. Flanges and bolts are sometimes used to join certain portions of the mains and sub-mains. Feeder pipes smaller than two inches in diameter are joined by screw fittings, but larger diameter feeder pipes are welded together. Stainless steel paint circulating piping (generally having a diameter of two inches or less) was first installed for the L-Car model. Sections of this piping are joined by special fittings.
At numerous locations along the main and sub-main(s) for each type of piping, feeder pipes are attached by welding or screw fittings and run to specific pieces of production machinery, apparatus, or equipment or to specific locations on the production line. Most of these feeder pipes carry liquid or compressed ah' from a main or sub-main to the production line, but, as described above, approximately one-half of the sludge treatment piping, the process waste piping and the condensate piping carry liquid from the production line to a main or sub-main.
Unlike the items of Manufacturing Property discussed in Sections IV, V, and VI above, process piping and pipe racks are addressed expressly in the b test of N.J.S.A. 54:4-1. The statute provides: “For purposes of this subsection, real property shall include pipe racks, and piping and electrical wiring up to the point of connections with the machinery, apparatus, or equipment of a production process as defined in this section.” The phrase “production process” is defined in N.J.S.A. 54:4-1.15 as follows: “ ‘Production process’ means the process commencing with the introduction of raw materials or components into a systematic series of manufacturing, assembling, refining or processing operations and ceasing when the product is in the form in which it will be sold to the ultimate consumer.”
Based on the above description of the piping systems, I conclude that the pipes and pipe racks and hangers are “affixed” as that term is used in N.J.S.A. 54:4-1. The mains and sub-mains are attached to the pipe racks and hangers which, in turn, are attached directly to the building, and the feeder pipes are attached *299 to the mains and sub-mains. Accordingly, the process piping is presumptively taxable. The parties presented evidence under both the b test and a test, so that the first step in my analysis is to address the provisions of the b test.
Plaintiff interprets the reference in the b test to the “point of connections” to the production process as referring to the first point of connection to the production process, that is, the first feeder pipe after a main leaves a tank or compressor. Plaintiff contends, therefore, that a main or sub-main is taxable up to the point where the first feeder pipe is attached. Defendant interprets the phrase “point of connections” to the production process to mean the point at which inflexible or “hard” metal piping is connected to flexible hoses which run from the hard piping to particular items of production machinery, apparatus, or equipment such as welding robots or paint spray atomizers. Defendant contends, therefore, that all of the mains, sub-mains, and feeder pipes in the plant are taxable up to the point of connection to flexible hoses.
The provisions of the b test relating to process piping were considered by the Tax Court in B.F. Goodrich Co. v. Oldmans Tp., 17 N.J.Tax 114 (Tax 1997). There, the court concluded that the phrase “up to the point of connections with the machinery, apparatus or equipment of a production process,” modified the terms “piping and electrical wiring” and did not modify the term “pipe racks.” Id. at 127. I concur with that interpretation of the statute. Accordingly, all pipe racks and hangers for process piping at the subject plant are taxable under the b test.
With respect to the specific piping at issue in B.F. Goodrich the Tax Court concluded that the production process “starts inside the manufacturing building and the point of connection is the meter on the fourth floor where the pipes merge and the materials are introduced into the latex manufacturing reactors, tanks and processing equipment.” Id. at 129. In reaching this conclusion, the court specifically rejected the contention by the plaintiff that the b test refers to the first point of connection to the production process, noting that “Rinaldi’s insertion of the word ‘first’ into the *300 statute and his conclusion that the point of connection occurs off-site, defies law and logic and renders the [Business Retention] Act meaningless as no piping would ever be taxable as real property under his interpretation.” Id. at 130.
I concur with the conclusion in B.F. Goodrich that the b test does not refer to the “first” point of connection of process piping to the production process. Significantly, the statute refers not to a single point of connection with machinery, apparatus, or equipment, but to the “point of connections.” The plural “connections” reflects a legislative contemplation that process piping could consist, as it does in the subject plant, of mains and sub-mains which are then connected to the production process at multiple points.
The parties have stipulated that the mains and sub-mains perform the same function throughout the plant. The operation of the mains, sub-mains and feeder pipes was described by one witness as “parallel.” Thus, a main or sub-main can be conceptualized as filled with liquid or compressed air, and the liquid or air is removed from, or additional liquid is delivered to, the main or sub-main by feeder pipes installed at various points along the main or sub-main. Consequently, there is no logical reason to differentiate, for purposes of determining taxability, between the portion of a main connecting a storage tank or air compressor with the first feeder pipe, and the portion of the main or any sub-main running from the first feeder pipe to all other feeder pipes attached to that main or sub-main. Each point at which a feeder pipe is attached to a main or sub-main, for the purpose of delivering fluid or air directly and exclusively to a specific piece of production machinery, apparatus, or equipment or to a specific location on the production line, or for the purpose of delivering fluids from a specific location on the production line to a main or sub-main, is a logical and appropriate point to designate as a point of connection to the production process under the b test. Accordingly, under the b test all feeder pipes satisfying this definition are not taxable, but all mains and sub-mains are taxable.
*301 Plaintiff appears to contend that the b test is the exclusive test for the taxability of process piping. Defendant asserts that the a test is also applicable in resolving the taxability issue. I conclude that, under the holding of the Supreme Court in General Motors Corp. v. Linden, supra, 150 N.J. 522, 696 A.2d 683, the b test does not constitute an exclusive test for taxability. As discussed previously, the Court stated that “the b test was not designed to override the a test for the benefit of business interests.” Id. at 536, 696 A.2d 683. The Court also noted that: “[t]he one constant in the evolution of the legislation has been the intent that property traditionally taxed as real property should remain so.” Id. at 537, 696 A.2d 683. Under the Court’s ruling, the traditional test for taxability appears in the a test, which, for constitutional reasons, is the ultimate determinant of the taxability of personal property. Thus, even though the thrust of the General Motors decision related to the portion of the b test describing “machinery, apparatus, or equipment used or held for use in business,” the principles articulated by the Supreme Court are applicable to all elements of the test.
With respect to process piping and pipe racks and hangers, therefore, the b test, as described in General Motors, performs the same function as it does with respect to the items of Manufacturing Property discussed above. Consequently, based on my conclusion that feeder pipes which directly and exclusively connect a main or sub-main with specific locations or specific pieces of machinery, apparatus, or equipment on the production line are not taxable under the b test, a presumption exists that the requirements for nontaxability under the a test have been satisfied, and defendant has the burden of persuasion to demonstrate that these feeder pipes are taxable under the a test. Because I have concluded that pipe racks and hangers and pipe mains and sub-mains are taxable under the b test, no presumption of nontaxability under the a test exists, and plaintiff has the burden of persuasion to demonstrate nontaxability under the a test of all of these items as well as any feeder pipes not directly and exclusively connecting a main or sub-main with particular locations or pieces of machinery, apparatus, or equipment on the production line.
*302 I conclude that plaintiff has failed to demonstrate that the pipe racks and hangers and pipe mains and sub-mains at the subject plant are nontaxable under the a test. Plaintiff did establish that pipe racks and hangers, and pipe mains and sub-mains can be removed without material injury to the real estate or to themselves (pipes cut apart using oxyacetylene torches can have their ends ground to a smooth condition suitable for re-welding). However, plaintiff failed to demonstrate that pipe racks and hangers or mains or sub-mains of any kind are regularly removed and relocated within the subject plant or that removal and relocation is a regular practice in the automobile assembly industry. Therefore, plaintiff failed to demonstrate that these items are not ordinarily intended to be affixed permanently.
Although, from time to time, mains and sub-mains are reconfigured to accommodate the location of other items on the production line (such as conveyors), in general, mains and sub-mains remain in place until the end of their useful lives. For example, a significant portion of the sludge treatment pipe mains and sub-mains installed in 1980 continues to function in the plant in its original location. Process waste mains and sub-mains installed in 1983 have not been changed. New mains were added to the compressed air system, but the mains installed in 1964 have not been moved and continue to be used. Steam and condensate mains also installed in 1964 continue to function in their original location, with new mains added to the system.
The individual in charge of relocating used equipment from plants closed by plaintiff to other plants testified that “normally the piping is ... pretty much left alone.” The witness further indicated that, in general, replacement of mains and sub-mains is easier and more economical than removing sections and relocating them. In connection with the closings of its plants, plaintiff did not remove and relocate process pipe mains or sub-mains. Even in the relocation of its Framingham, Massachusetts plant, plaintiff did not remove and reinstall the pipe mains or sub-mains.
In support of its contentions as to nontaxability, plaintiff cites the conversion of the subject plant from the E-K Car model to the *303 L Car model, when the entire weld water system in the plant, including mains, was removed and replaced. However, plaintiff did not demonstrate that the removed mains and sub-mains were relocated and re-used. In addition, the replacement was primarily the result of the condition of the mains. One of plaintiffs witnesses described the removed system as “rusting out” and “pretty much worn out.”
With respect to feeder pipes directly and exclusively connecting mains or sub-mains to specific pieces of production machinery, apparatus, equipment or specific locations on the production line, I conclude that defendant has failed to demonstrate taxability under the a test. These pipes, as described above, are attached to mains or sub-mains, and removal will not cause material injury to the real estate or to the mains, sub-mains or feeder pipes. The evidence establishes that all the piping having a diameter of two inches or less is joined together by screw fittings, or, in the case of stainless steel paint circulating pipes, by special fittings, and, therefore, is easily detachable and moved. Feeder pipes have been removed and relocated in the subject plant. Stainless steel paint circulating pipe has been removed and relocated in the subject plant, and plaintiff has moved this piping from plant to plant because the piping is expensive and reuse is more economical than replacement. The feeder pipes, therefore, are not ordinarily intended to be affixed permanently, and, as a result, are nontaxable under the a test.
VIII.
Electrical Distribution
Electric power is distributed in the subject plant as follows. Electricity provided by the electric utility company feeds into transformers at the plant. From the transformers, the power is distributed to substations which also contain transformers. From the substations, the reduced voltage is then distributed to bus ducts located throughout the plant. A bus duct consists of large copper bars, separated by insulators, enclosed within a steel box. *304 Special plugs are inserted in the bus ducts to connect rigid conduit which carries power from the bus ducts to disconnect devices (fuses or circuit breakers). Rigid or flexible conduit carries the power from the disconnect devices to items of machinery, apparatus, or equipment in the plant or to specific locations on the production line. In some instances, the power goes directly to the machinery, apparatus, or equipment, and, in others, the power goes to a control panel for the equipment.
N.J.S.A. 54:4-l(b) provides: “For purposes of this subsection, real property shall include pipe racks, and piping and electrical wiring up to the point of connections with the machinery, apparatus or equipment of a production process as defined in this section.” (The definition of “production process” is discussed above in Section VII in the context of process piping.) Plaintiff contends that the point of connection of the electric wiring to the production process occurs when the power reaches either the transformers located outside the subject plant but on the property, or the substations located on the roof of the property. Defendant contends that the point of connection does not occur until the power reaches the disconnect device for an item of machinery, apparatus or equipment or for a control panel.
In my discussion of process piping, I concluded that, for purposes of the b test, a point of connection to the production process occurred at each point at which a feeder pipe was attached to a main or submain for the purpose of delivering fluid or air directly and exclusively to a specific piece of production machinery, apparatus, or equipment or to a specific location on the production line. A similar analysis should be applied to the electrical wiring which is governed by the same statutory language as applies to process piping. The point in the electric power system which is analogous to the point of connection of a feeder pipe to a main or submain is the bus duct. Up to and including the point at which the power reaches the bus duct, it is not distributed or directed toward any particular piece of equipment or location on the production line. The power supply wires and facilities up to and including the bus ducts are equivalent to the mains and submains in the process *305 piping system. Accordingly, I conclude that the “point of connections” of the electrical wiring in the subject plant with the machinery, apparatus and equipment of the production process occurs at the bus ducts located throughout the plant. The bus duets themselves are part of the pre-connection distribution system. Therefore, under the b test, all wiring and distribution facilities up to and including the bus ducts are taxable, and all wiring and disconnect devices between the bus ducts and the machinery, apparatus or equipment or locations on the production line are not taxable.
Under the analyses in Section VII of this Opinion, the b test does not provide the exclusive test for determining taxability of process piping or electrical wiring. The a test must be considered and provides the ultimate basis for decision. Pursuant to the principles set forth in Section VII with respect to process piping, plaintiff retains the burden of persuasion to demonstrate that the electric wiring and power distribution facilities up to and including the bus ducts satisfy the three criteria for nontaxability under the a test. Defendant, however, has the burden of persuasion to demonstrate that the waring and disconnect devices between the bus ducts and items of machinery, apparatus, or equipment or control panels do not satisfy the a test criteria.
Plaintiff failed to establish that the electric wiring and distribution facilities up to and including the bus ducts can be removed without material injury to themselves or to the real estate or that such wiring and distribution facilities are not ordinarily intended to be affixed permanently. Accordingly, I conclude that all of the power distribution lines and facilities up to and including the bus ducts are taxable under the a test.
The wiring from the bus ducts to the disconnect devices was rigid conduit, and the wiring from the disconnect devices to specific items of machinery, apparatus, or equipment or to control panels was either rigid or flexible conduit. The conduit was attached by screws and clamps and the disconnect devices were screwed or clamped to walls or to metal bar structures (unistruts). *306 Defendant made no showing that the method of attachment of either the conduit or the disconnect devices was such that removal would result in material injury to the conduit, the devices, or the real estate.
Defendant did establish, however, that used electrical conduit has no salvage value, and that the conduit and disconnect devices are rarely if ever, moved and re-used. The testimony by one of plaintiffs witnesses as to the moving of task lighting (see Section XI of this Opinion) is consistent with defendant’s proofs. The witness testified that the lighting could be moved by disconnecting it at the “junction box” (that is, disconnect device), thereby implying that the power distribution lines and facilities up to and including the disconnect device are permanent in nature.
Based on the preceding discussion, I conclude that defendant has demonstrated that the rigid conduit from bus ducts to disconnect devices, and the devices themselves, are ordinarily intended to be affixed permanently. Therefore, these items are taxable under the a test. I further conclude that defendant has failed to demonstrate that the conduit between disconnect devices and any items of machinery, apparatus, or equipment or control panels, or the control panels themselves, are ordinarily intended to be affixed permanently. Therefore, these items are not taxable under the a test.
IX.
Automated Storage and Retrieval Systems
During each of the years under appeal, the subject plant contained an automated storage and retrieval system facility, commonly referred to as a stacker. For the period 1983 through 1992, the facility was a free-standing building approximately seventy-five feet high and containing approximately 75,000 square feet of area. This facility (the “Old Stacker”) contained a multilevel steel racking system which was used for the storage of completed automobiles. The steel vertical support columns for the racking system were bolted to steel plates located on a *307 concrete pad, and the racking system was constructed by bolting pre-fabricated sections together and to the vertical supports, with some field welding required. The facility had lighting and a dry sprinkler system, but no heating. The exterior walls of the Old Stacker consisted of sheet metal panels attached by zip screws to the racking system and to the vertical supports. Above the racking system, steel purlins were installed to support a roof constructed of sheet metal decking covered by a rubber roofing membrane, with gutters and down-spouts. Access to the facility was through a separate, but adjoining, one-story building (the “Low Bay Building”) which plaintiff acknowledged was taxable. The completed vehicles were driven through an opening in one wall of the Low Bay Building into the Old Stacker and placed on metal pallets. A computer-controlled elevator placed the pallets in specific bays or slots within the racking system. The Old Stacker was demolished in 1993 or 1994 after production of the L-Car model terminated. The ST Truck model, which succeeded the L-Car, would not fit into the racking system.
During 1997 and 1998, plaintiff constructed another automated storage and retrieval system facility (the “New Stacker”) by extending the second floor of the plant and attaching a racking system to the floor extension. The construction of the New Stacker included vertical steel support columns approximately eighty feet high which were bolted to a concrete slab. The multiple level steel racking system consisted of pre-fabricated sections bolted together (with some welding) and bolted to the vertical steel supports. On three sides of the facility, exterior walls consisting of insulated sheet metal panels were attached by zip screws to the racking and the vertical columns. On the fourth side, which abutted the second floor plant extension, only a partial sheet metal wall was installed. The roof consisted of steel decking supported by horizontal steel beams which were attached to the rack structure. The facility had overhead lighting, small unit heaters served by natural gas lines, and a sprinkler system. The New Stacker was used to store vehicle bodies (not completed vehicles) until needed on the production line. Each vehicle body was placed on a carrier and transported by conveyor to the *308 facility, where the carrier was deposited on a turntable and then transported by one of two computer-operated cranes to a specific bay or slot in the racking system. The cranes operated on rails. The upper rails were bolted to the top of the racking system, and the lower rails were bolted to the concrete floor.
Plaintiff contends that the racking systems in the Old and New Stackers, as well as the exterior walls and roof of each facility, are machinery, apparatus or equipment which are part of the production process and, therefore, not subject to property tax under the b test. In addition, plaintiff contends that the stackers satisfy the three criteria for nontaxability under the a test. Defendant contends that: (1) the stackers constitute “improvements” and, therefore, are subject to tax without consideration of the tests applicable to personal property under N.J.S.A. 54:4-1; (2) even if the stackers are not improvements, they are “structures” which are taxable under the b test; and (3) in any event, the stackers are taxable because neither could be removed without material injury to the real property and because automated storage and retrieval systems such as the Old and New Stacker are ordinarily intended to be affixed permanently to the real property.
Under N.J.S.A. 54:4-1, taxable real property includes “all land and improvements thereon” and, subject to exclusion from taxation under the a and b tests, “personal property affixed to the real property.” The distinction between improvements and personal property affixed was considered by the Supreme Court in R.C. Maxwell Co. v. Galloway Tp., supra, 145 N.J. 547, 679 A.2d 141. The Court held that an “improvement” to which the statute refers is “an addition to land that is obviously, unmistakably, and inherently permanent.” Id. at 555, 679 A.2d 141 (citations omitted).
I conclude that neither of the stacker facilities satisfies the definition of improvement in R.C. Maxwell. Although, from an exterior view, each facility would appear to be a building or part of a building, the evidence demonstrated that disassembly of each facility could be accomplished in a manner far different from, and simpler than, demolition of a more traditional building. The exterior walls and roofs of the stackers could be readily unscrewed *309 and detached, and the interior steel racking and support structure - could be unbolted and disassembled. The facilities therefore, are not “inherently” permanent.
Plaintiff does not dispute that both of the stackers were affixed to real estate. Accordingly, they are presumptively taxable. As set forth above, plaintiff contends that the stackers are not taxable under the b test because they are machinery, apparatus or equipment used in business which “is neither a structure nor machinery, apparatus or equipment the primary purpose of which is to enable a structure to support, shelter, contain, enclose or house persons or property.” N.J.S.A. 54:4-1b. See also N.J.A.C. 18:12-10.1.
I conclude that each stacker is taxable under the b test because each was a structure within the meaning of the test, and the primary purpose of each racking system and its related equipment (including the elevator equipment in the Old Stacker, but excluding the cranes in the New Stacker which defendant acknowledges are not taxable) was to enable the structure to shelter and contain property, namely, completed automobiles or vehicle bodies. Each stacker had its own foundation, its own structural steel, roof purlins similar to those installed in the main plant facility, exterior walls, independent roof, lighting and sprinklers. The New Stacker had heating facilities. The racking system in the Old Stacker was aptly described by one of defendant’s witnesses as a sophisticated automated multi-level parking garage. A similar description applies to the racking system in the New Stacker even though the property being stored consisted of automobile bodies and not completed vehicles.
Because I have concluded that the stackers and the racking systems are taxable under the b test, plaintiff retains the burden of establishing nontaxability under the a test (see Section II of this Opinion). I conclude that plaintiff failed to establish that either stacker satisfied the three criteria for nontaxability under the a test. Plaintiff presented no evidence as to the method of installation or removal of the elevator equipment in the Old *310 Stacker, but did demonstrate that, except for this equipment and the concrete floor in each stacker, the stackers could be removed without material injury to themselves. As discussed above, the exterior walls could be unscrewed, the roof decking removed although the insulation and rubber membrane resulting from disassembly would be sacrificed and some of the exterior wall panels would be damaged in the removal process. This damage to the roofing and wall panels would be insufficient to constitute material injury. See R.C. Maxwell, supra, 145 N.J. at 558, 679 A.2d 141 (holding that removal of wooden billboards, involving disassembly and irreparable damage to some support beams, does not result in material injury to the billboards). The racking system could be disassembled by unbolting the component pieces and by unbolting the supporting members from the concrete floors. However, the concrete slab floors could be removed only by demolition, and would not satisfy this element of the a test.
Plaintiff did not demonstrate that either stacker could be removed without material injury to the real estate or that either is not ordinarily intended to be affixed permanently. Removal of the Old Stacker would require building a portion of the wall of the Low Bay Building through which vehicles entered the Old Stacker. Removal of the New Stacker would require building a wall on the plant building at the point of connection between the extension of the second floor of the building and the stacker. Although the construction of these walls is certainly feasible, it also represents a major repair similar to patching a large hole in the roof. As discussed in Section III of this Opinion, the significance of the repair in terms of the material injury test is not to be measured on a relative basis, that is, how large the repair area is in relation to total building area, but is to be measured based upon the significance of the repair viewed on its own. I conclude that the wall-building required in connection with the removal of either stacker is such that material injury to the real estate should be deemed to result from the removal.
With respect to the third element of the a test, plaintiff failed to prove that facilities such as the Old and New Stacker are not *311 ordinarily intended to be affixed permanently. Automated storage and retrieval system facilities are not uncommon in the automobile assembly industry. One of plaintiffs witnesses was personally responsible for planning and developing specifications for a number of such systems. One of defendant’s witnesses testified that the New Stacker was a typical storage building which was “thoroughly common with car assembly plants.” Although such facilities are not unique to plaintiffs plant, plaintiff failed to establish any instance in which a stacker facility comparable in size to the Old Stacker or New Stacker had been disassembled and moved to a new location. As noted above, when the Old Stacker was no longer usable, plaintiff did not disassemble and relocate the facility or attempt to sell it. Plaintiff demolished and scrapped it. One of plaintiffs witnesses testified that the facility was demolished because: “There is not a real big market for those kinds of ASRS’s [(automated storage and retrieval systems) ] because they are the largest probably around.” The same witness testified that automated storage and retrieval systems smaller than either stacker had been moved. His only testimony as to the moving of a facility similar in size to the subject stackers was triple or quadruple hearsay to the effect that a large stacker facility had been moved in another industry. I attribute little significance to this testimony because of its hearsay nature and because the witness was unable to describe the size or construction of the facility, and could not provide any information as to what was moved, how the move was accomplished, when the move took place, or the reasons for the move.
Given the relative frequency with which automated storage and retrieval systems are used in the automobile assembly industry, I infer from plaintiff’s failure to present any proofs as to the disassembly and relocation of facilities similar in size to the Old Stacker or New Stacker that disassembly and relocation rarely, if ever, occur. Based on this inference and plaintiffs demolition of the Old Stacker, I conclude that stacker facilities of the size and nature of those installed at the subject property are ordinarily intended to be affixed permanently, and, therefore, do not qualify *312 as nontaxable personal property under the third element of the a test.
In summary, I hold that the Old Stacker and the New Stacker, including their respective walls, roofs, racking systems, concrete slab floors, the elevator equipment in the Old Stacker, and the crane rails (but not the cranes) in the New Stacker, are taxable under N.J.S.A. 54:4-1.
X.
Task Stations and Task Lighting
At various locations along the production line in the subject plant, plaintiff has installed task stations and task lighting. The task lighting illuminates the task stations which are platforms (including mezzanines) and workrooms at which specific production line functions are performed. The platforms are constructed of steel and are elevated above the plant floor, some supported from below by steel supports bolted to the floor and some supported from above by hanger steel attached to the structural steel beams of the plant. The flooring of the platforms is either steel mesh or diamond plate steel. Most mezzanines have dimensions of approximately ten feet by twenty feet (although one mezzanine was approximately forty feet by fifty feet). Other platforms are of various sizes, including narrow catwalk-type structures, and usually have steel railings welded or bolted to the portion of their perimeters not abutting production line conveyors or other equipment. The mezzanines have stairs bolted or welded to them, as do some of the other platforms. Platforms suspended from hanger steel generally are reached by ladders which are not bolted to the floor. All of the platforms are constructed of prefabricated steel sections and are assembled at the plant.
Some of the platforms adjoin booths and ovens and some adjoin, or are located under, specific portions of the conveyor line. Some workrooms are located away from the conveyor path. Many of the task stations have dropped ceilings suspended by chains or cables from steel beams. These ceilings provide a dust shield for *313 the workers and, in some instances, are used as an attachment point for task lighting (see discussion below). Some workrooms have walls or partial walls. The workroom floors are the plant floor. Because the platforms and workrooms are related to the performance of specific functions on the production line, if the production line is reconfigured and a function is relocated, the related platform or workroom is of no further utility unless moved to an appropriate location on the reconfigured line.
 All of the task station platforms and dropped ceilings are attached to the real estate either by bolting to the floor of the plant, by attachment to the beams of the building, or by attachment to hanger steel attached to the beams of the building. The full or partial walls of workrooms are attached to the building floor. Consequently, all of the task stations are presumptively taxable. Because the task stations are used in connection with plaintiffs production line, they constitute apparatus or equipment used in business, and, therefore, are not taxable under the b test. As a result, pursuant to the discussion in Section II of this Opinion, defendant has the burden of establishing that the task stations are taxable under the three criteria of the a test.
The proofs presented by the parties with respect to the task stations were very limited in quantity and scope, consisting primarily of the testimony of one of defendant’s witnesses. From the evidence as to the methodology for the construction and installation of the platform task stations, I infer that these stations could be disassembled without material injury to themselves or to the real estate. The parties presented no credible evidence as to the methodology or effects of removal of dropped ceilings or walls. Because defendant has the burden of persuasion, the absence of proof results in my regarding the dropped ceilings and walls as removable without material injury to themselves or the real estate.
As set forth above, relocation of task stations is necessary if they are to continue to have utility when the production line is reconfigured. The preponderance of the limited evidence as to *314 relocation of platforms, dropped ceilings, and walls established that they ordinarily are not moved, and that, when the production line in the subject plant has been reconfigured, the task stations have been demolished and new ones constructed on the reconfigured line. In addition, as discussed in Section IV of this Opinion, booths and ovens ordinarily are not relocated. Consequently, task stations related to and integrated with booths and ovens ordinarily are not relocated. As discussed in Section VI of this Opinion, conveyors ordinarily are relocated. However, the proofs which plaintiff presented as to the movement of conveyors were not accompanied by proofs that task station platforms related to the conveyors were also moved. The only proofs on this issue were from the defendant and demonstrated that the platforms have not been moved when the production line has been reconfigured.
Based on the preceding discussion, I conclude that the task stations, including platforms, dropped ceilings, and partial or full walls in workroom areas, are ordinarily intended to be affixed permanently under the discussion of that standard contained in Section III of this Opinion. Therefore, the task stations are taxable under N.J.S.A. 54:4-1.
Because the ambient light in the subject plant is insufficient for the performance at task stations of certain production line work, task lighting is installed to illuminate the stations. This lighting consists of fluorescent light fixtures which are either installed individually or in banks. Some individual fixtures are attached to dropped ceilings. Others are suspended from chains attached to beams or to hanger steel, some are installed in metal support structures hanging by chains from beams or hanger or header steel, and some are installed vertically in steel lattice-work structures (unistruts). Generally, flexible cable or conduit from the lighting is “hard wired” to a control panel. Removal of the fixtures requires disconnection of electric service and either removal of the fixtures and their support structures from the chains or unbolting of the fixtures and support structures.
■ Based on the preceding discussion, I conclude that the task lighting is attached to the real property and, therefore, *315 presumptively taxable. Because the task lighting is apparatus used in business, the lighting fixtures and support structures are not taxable under the b test. Accordingly, defendant has the burden of establishing that the task lighting is taxable under the a test. With respect to the criteria of the a test relating to the effect of removal, the proofs established that task lighting can be removed without material injury to itself or to the real estate, even though plaintiff did not present specific examples of instances when task lighting, either in the subject plant or elsewhere in the automobile assembly industry, had been relocated. I am satisfied from the general descriptions of what has occurred in the subject plant and in other automobile assembly facilities that moving task lighting is a regular occurrence, and, therefore, the lighting is not ordinarily intended to be affixed permanently. I reach this conclusion even though, in moving equipment from its Framingham, Massachusetts plant to Silao, Mexico, plaintiff did not move task lighting fixtures which had already had been installed in the plant.
In summary, I conclude that the task lighting is nontaxable under the a test of N.J.S.A. 54:4-1.
XI.
Tanks
Plaintiff has utilized many different tanks (mostly steel, but some plastic), serving a variety of functions in connection with its automobile assembly operations. Some of the tanks were fully assembled by the tank manufacturer, delivered to the subject plant by truck, lifted from the truck by crane, and placed on concrete supports or saddles. Other tanks arrived in steel sections which were welded together at the plant. Defendant contends that all but four of the tanks at the plant are taxable, and plaintiff contends that all but four are non-taxable.
For tax years 1983 through 1985, during which plaintiff produced the E-K Car model, the following tanks are in issue:
*316 Description Size (gallons)
Process body elpo 30,000
Process small parts elpo 15,000
Process sheet metal elpo 15,000
Small parts dump elpo 15,000
Sheet metal dump elpo 15,000
Freon 5,000
Centra! sludge 90,000
Number 1 paint thinner 12,000
Number 2 paint thinner 12,000
Number 3 paint thinner 12,000
Number 4 automatic transmission 12,000
Number 5 elpo dump 15,000
Number 6 elpo dump 15,000
Number 7 diesel 12,000
Number 8 solvent 12,000
Number 9 power steeling 12,000
Number 10 manual transmission 12,000
Number 11 unleaded gas 24,000
Number 12 antifreeze 12,000
For these years, and continuing through 2001, the plant also included tanks described by the parties as PH-1 empty, PH-2 fuel oil, PH-3 fuel oil, and firewater, all of which plaintiff has acknowledged to be taxable, and an elpo resin primer tank and dirty purge used thinner tank, both of which defendant has acknowledged to be nontaxable.
For tax years 1986 through 1992, during which plaintiff produced the L Car model, all of the previously described tanks remained in place at the plant, except for the process body elpo, process small parts elpo, and process sheet metal elpo tanks, all of which were removed, and the freon tank, which was relocated. Plaintiff installed the following additional tanks which are in issue:
Description Size (gallons)
Blend 13,500
Lime slurry 14,000
Elpo waste 60,000
PW1 process waste 827,300
PW2 process waste 827,300
PW3 process waste 827,300
Cl clarifier 230,300
C2 clarifier 230,300
*317 Sludge thickener [7] 76,700
Stage 1 phosphate 72,000
Stage 4 phosphate 29,200
Stage 5 phosphate 72,000
Stage 6 phosphate 29,000
Dump stage 1 phosphate 80,000
Dump stage 5 phosphate 80,000
Process elpo 55,000
Dump elpo 65,000
Deionized water 12,000
Prime sludge 60,000
In addition to the preceding tanks, plaintiff installed a clear coat enamel tank and empty paint tank. Defendant does not contend that either of these tanks is taxable.
For tax years 1993 through 2001, during which plaintiff produced the ST Truck model, all of the tanks in place during the 1986 to 1992 period remained in place except for the small parts dump elpo, the sheet metal dump elpo and freon, all of which were removed. In addition, during the 1993 to 2001 period, the tanks identified above as Number 1 paint thinner through Number 12 antifreeze were abandoned in place until removed from the plant in late 1999. The prime sludge tank was reworked and renamed the tutone sludge tank. Plaintiff added the following tanks which are in issue:
Description Size (gallons)
Freon 5,000
Gasoline 20,000
Automatic transmission 12,000
Antifreeze 10,000
Windshield washer 7,000
Power steering 7,000
*318 Axle lube 9,000
Dump chilled water 6,000
The taxability of tanks is addressed specifically by N.J.S.A. 54:4-1.12, which provides as follows:
For the purposes of chapter 4 of Title 54 of the Revised Statutes and notwithstanding the provisions of R.S. 54:4-1, a storage tank having a capacity of more than 30,000 gallons is deemed to be real property. The fact that products are mixed, blended, heated or subjected to a similar non-production process within a storage tank shall not in itself render that tank personal property.
[N.J.S.A. 54:4-1.12.] [8]
A predecessor to this statute was included in Chapter 117. The BRA amended the statute to limit the first sentence to “storage” tanks and to add the second sentence. Under its express provisions, the statute governs the taxability of storage tanks in excess of 30,000 gallons. Neither the statute nor any related regulation defines the term “storage tank,” or provides criteria for use in determining when a tank containing materials used in the production process, or a tank in which materials are subjected to any of the “non-production” processes described in the second sentence of the statute, ceases to qualify as a storage tank.
Plaintiff contends that a tank should not be classified as a storage tank, and should be classified as a process tank, when the tank is used “to do something to the product” or to treat materials used in the production process. Defendant asserts that process tanks are limited to those containing product, that is, material which is installed on or incorporated into the vehicle (as distinguished from an item such as gasoline or transmission fluid which is not incorporated into the vehicle) and leaves the plant with the vehicle, and that all other tanks are storage tanks.
In the absence of a statutory or regulatory definition, nontechnical words should be accorded their “generally accepted *319 meaning.” N.J.S.A 1:1-1. The applicable dictionary definition of “storage” is “the state of being stored.” Meniam-Webster’s Collegiate Dictionary 1159 (10th ed.1996). The applicable definitions of “store” are “1. lay away, accumulate... 3. to place or leave in a location ... for preservation or later use or disposal.... ” Ibid. In Black’s Law Dictionary (5th ed.1979), the term “store” is defined as follows: “To keep merchandise for safe custody, to be delivered in the same condition as when received, where the safe-keeping is the principal object of deposit, and not the consumption or sale.” Id. at 1273. The Tax Court used these definitions to interpret the word “storage” under N.J.S.A. 54:32B-3, a sales tax statute, in Tamton Enterprises, Inc. v. Director, Div. of Taxation, 5 N.J.Tax 209, 212 (Tax 1983), aff'd o.b., 6 N.J.Tax 347 (App.Div.1984), and concluded that “storage” does not imply “a degree of permanency” but refers to “a temporary placement.” Id. at 213. But cf. State v. Gargiulo, 103 N.J.Super. 140, 246 A.2d 738 (App.Div.1968) (holding, in the context of interpreting a municipal zoning ordinance, that “[t]he word storage connotes permanency and not a transient situation.” Id. at 144, 246 A.2d 738.).
The legislative history of N.J.S.A. 54:4-1.12 provides assistance in defining the term “storage tank.” The statute as initially enacted in 1986, as part of Chapter 117, provided: “For the purposes of Chapter 4 of Title 54 of the Revised Statutes and notwithstanding the provisions of R.S. 54:4-1, a tank having a capacity of more than 30,000 gallons is deemed to be real property.” When introduced in the Legislature, as Senate Bill 1858, the statute classified as real property “any fuel storage tank with a capacity of at least 10,000 gallons, whether underground or above-ground, used or held for use in any business, transaction, activity or occupation conducted for profit.” The Senate County and Municipal Government Committee deleted this provision on the basis that “the large petroleum storage tanks used by refineries are improvements to real property and therefore included in the definition of real property.” Senate County and Municipal Government Committee Statement to S. 1858 (April 7, 1986). The Assembly amended the Bill to define “tank farms” as “improve *320 ments to real property,” S. 1858 (Assembly Reprint), and then substituted for this definition a provision defining “a tank used to store hazardous substances” having a capacity of more than 30,000 gallons as “real property.” S. 1858 (Second Assembly Reprint). Governor Kean expressed concern about the constitutionality of classifying tanks as realty based on the substances stored in them, and recommended deletion of the “hazardous substances” standard. Governor’s Reconsideration and Recommendation Statement as to S. 1858, (Sept. 5, 1986). In response, S. 1858 was amended to delete the phrase “used to store hazardous substances,” then enacted as part of L. 1986, c. 117, and codified as N.J.S.A. 54:4-1.2.
The initial version of the BRA, introduced in the Senate in 1992 as Senate Bill 332, amended N.J.S.A. 54:4-1.12 to exclude from classification as real property a tank having a capacity of more than 30,000 gallons “used or held for use directly and primarily in the manufacture, assembly, refining or processing of property” (the “Manufacturing Exclusion”). Governor Florio recommended changes to the legislation based on concerns expressed by municipalities as to the impact of the Bill on the taxation of “certain items, including piping, pipe racks, electrical wiring, and storage tanks — items which have traditionally been taxable as real property.” Governor’s Reconsideration and Recommendation Statement as to S. 332 (June 1, 1992). These changes, all of which were incorporated in the Bill as enacted, L. 1992, c. 24, deleted the Manufacturing Exclusion, limited the applicability of N.J.S.A. 54:4-1.12 to storage tanks, and added the language now in effect relating to non-production processes. The Governor described the amendments as intended “to reassure the municipalities that [piping, pipe racks, electrical wiring, and storage tanks] will remain fully taxable.” Ibid.
Based on the dictionary definitions, the analysis in Tamton Enterprises, the legislative history of N.J.S.A. 54:4-1.12, and the legislative history and policy considerations discussed in Section II of this Opinion, I conclude that a “storage tank” under N.J.S.A. 54:4-1.12 is a tank which does not participate in the *321 production process and passively contains liquids or gases, on a long or short term basis, for future use in the production process or for disposal. Cfi N.J.AC. 5:70-3.2(a)2(iii)(ll) (defining “storage” under the New Jersey Fire Prevention Code as meaning “articles that are stored, kept or accumulated for some future use, or for disposal, and drawn upon as needed”). A process tank is a tank in which, or by means of which, an operation or function integral or essential to a “production process” as defined in N.J.S.A. 54:4-1.15 (“the process commencing with the introduction of raw materials or components into a systematic series of manufacturing, assembling, refining or processing operations and ceasing when the product is in the form in which it will be sold to the ultimate consumer”) takes place, even if the operation or function is ancillary to the production process. The operation or function need not result in the incorporation of materials into a vehicle or installation of materials on a vehicle. The occurrence of a non-production process in a tank does not automatically result in the tank’s being categorized as a process tank, just as, under the express language of N.J.S.A. 54:4-1.12, the occurrence of any such process does not automatically result in a tank’s being classified as personal property.
The preceding definitions are consistent with the Legislature’s objectives as to the taxation of tanks as embodied in Chapter 117 and the BRA, and are consistent with the Supreme Court’s interpretation of the BRA in General Motors Corp. v. Linden, supra, 150 N.J. 522, 696 A.2d 683. Under these definitions, petroleum storage tanks and similar tanks with capacities in excess of 30,000 gallons will be taxable. However, smaller storage tanks and process tanks will be taxable only if they satisfy the criteria for taxability applicable to other personal property used in business.
Some tanks at the subject plant arguably perform both a storage and process function. It is necessary to classify each of these tanks as “storage” or “process” in order to determine taxability. An appropriate standard for making this classification is that of dominant or principal use, a standard which has been *322 employed in other areas of taxation. For example, whether land used for multiple purposes qualifies for farmland assessment is determined by its dominant or principal use. City of East Orange v. Livingston Tp., 102 N.J.Super. 512, 531-39, 246 A.2d 178 (Law Div.1968), aff'd, 54 N.J. 96, 253 A.2d 546 (1969); Green Pond Corp. v. Rockaway Tp., 2 N.J.Tax 273, 287-91 (Tax 1981), aff'd o.b., 4 N.J.Tax 535 (App.Div.1982). In the sales tax context, the “real object” of a transaction will determine taxability. Tamton Enterprises, supra, 5 N.J. Tax 209 (holding that receipts from a coat-checking service were subject to sales tax under a statute imposing tax on the service of storing tangible personal property because the “primary purpose” or “principal object” of checking a coat is safekeeping of the garment. Id. at 214.) See also, Urso & Brown, Inc. v. Director, Div. of Taxation, 19 N.J.Tax 246, 257 (Tax 2001), aff'd 353 N.J.Super. 248, 802 A.2d 543 (App.Div.2002); Dow Jones & Co. v. Director, Div. of Taxation, 5 N.J.Tax 181, 189-90 (Tax 1983), aff'd 193 N.J.Super. 80, 472 A.2d 168 (App.Div.), certif. denied 99 N.J. 153, 491 A.2d 668 (1984).
Based on the discussion in the preceding paragraph, I conclude that, if the dominant or principal use of a tank is for storage of materials, the use of those materials in the production process will not affect the status of the tank as a storage tank. (As set forth above, the occurrence in the tank of a non-production process will not affect its status as “storage” or “process.”) Conversely, if the dominant or principal use of a tank is for the taking place of an operation or function that is integral or essential to the production process, the storage of materials in the tank before, during, or after the operation or function will not cause the tank to be classified as a storage tank under N.J.S.A 54:4-1.12.
If a tank is a storage tank with a capacity of more than 30,000 gallons, its taxability must be determined solely by reference to N.J.SA 54:4-1.12. If, however, a tank is a storage tank with a capacity of 30,000 gallons or less, or if a tank is not a storage tank, then taxability is governed under the provisions of N.J.S.A. 54:4-1. As discussed in Section II of this Opinion, the initial determination which a court must make in deciding the *323 taxability of personal property under this statute is whether the property is “affixed.” If an item of personal property is not “affixed,” then that item is not taxable under N.J.S.A. 54:4-1, and, therefore, no analysis under the b test or a test of that statute is necessary. If, however, an item of personal property is “affixed,” the b and a tests must be applied in the manner set forth above.
The meaning of “affixed” in the context of N.J.S.A 54:4-1 has not been addressed by the New Jersey courts. The Director of the Division of Taxation has defined the term to mean “fastened or attached physically.” N.J.A.C. 18:12-10.1. Black’s Law Dictionary defines “affix” as follows:
Fix or fasten in any way to attach physically. To attach, add to, or fasten upon, permanently, as in the case of fixtures annexed to real estate. A thing is deemed to be affixed to land when it is attached to it by the roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws.
[Black’s Law Dictionary, supra at 56.]
The standard dictionary definition of “affix” is “1: to attach physically... 2: to attach in any way ...Merriam-Webster’s Collegiate Dictionary, supra at 20.
In California, the statutory definition of fixtures incorporates much of the definition quoted above from Black’s Law Dictionary. Cal. Civil Code § 660. In deciding that 750 ton cranes operating on, but not attached or fastened to, railbeds were fixtures under this statutory standard,[9] the California Court of Appeals stated as follows:
[Tjhe modem trend of case law underlines that fixtures include articles such as heavy machinery whose permanent annexation is not manifested by the use of bolts, screws and the like, but which are of such weight that the mere retention in *324 place by gravity is sufficient to give them the character of permanency and therefore affixation to the realty.
[Seatrain Terminals of Cal., Inc. v. Almada County, 83 Cal.App.3d 69, 75, 147 Cal.Rptr. 578 (1978) (citation omitted).]
Similarly, in United States v. San Diego Cty., 53 F.3d. 965 (9th Cir.1995), the court, applying California law, relied on Seatrain Terminals in holding that a nuclear device weighing 400 to 500 tons was a fixture subject to ad valorum tax. The court stated as follows: “A device can be, and in this ease clearly is, annexed to the property through gravity... The real estate has also been modified to accommodate the device. Tunnels have been dug and a reinforced concrete flooring has been installed. Thus the property has been adapted for the device.” Id. at 968 (citation omitted). The Oregon Tax Court interpreted a statute defining real property as including machinery and equipment “affixed” to mean that “large items may be found constructively ‘affixed’ to the land or buildings merely by virtue of them weight and size.” Seven-Up Bottling Co. of Salem v. Department of Revenue, 10 Or.Tax 400 (1987) (citation omitted).
Because California and Oregon have statutory standards different from the language of N.J.S.A. 54:4-1, the decisions of them courts do not provide definitive guidance in interpreting the New Jersey standard. However, the courts’ analyses, when considered with the dictionary definitions, and the regulation of the New Jersey Division of Taxation, assist in defining “affixed” as used in N.J.S.A 54:4-1. Based on all of the foregoing, I conclude that whether an item of personal property is “affixed” should be determined as follows. Where the item is physically attached or fastened, for example, by welding, cement, bolt, screw, or other material or device, to a building, or to land, the item wall be deemed affixed within the meaning of the statute. An item of personal property not physically attached or fastened to a building or land will be deemed affixed where the item is sufficiently large and heavy that gravity alone holds it in place and the building or land has been specially modified or adapted to accommodate or enclose the item.
*325 The evidence demonstrated that certain of the tanks in issue were used for storage and had a capacity of less than 30,000 gallons. Therefore, they are not taxable under N.J.S.A. 54:4-1.12, but must be analyzed under N.J.S.A. 54:4-1. Those tanks were prefabricated and trucked to the subject facility where they were installed on concrete supports or saddles, but they were not otherwise attached or fastened. I conclude that these tanks were not affixed, and, therefore, are not taxable under N.J.S.A. 54:4-1. The non-affixed tanks are the following:
A) Tanks in place during the period 1983 to 1985:
Small parts elpo dump
Sheet metal elpo dump
Freon
Number 1 paint thinner
Number 2 paint thinner
Number 3 paint thinner
Number 4 automatic transmission
Number 5 elpo dump
Number 6 elpo dump
Number 7 diesel
Number 8 solvent
Number 9 power steering
Number 10 manual transmission
Number 11 unleaded gas
Number 12 antifreeze.
B) Tanks installed during the period 1986 to 1992:
Deionized water.
C) Tanks installed during the period 1993 to 2001:
Freon
Gasoline
Automatic transmission
Antifreeze
Windshield washer
Power steering
Axle lube
Chilled water dump.
The remaining tanks in issue require a more detailed discussion of their construction, - function, and mode of installation. These *326 tanks (collectively the “Remaining Tanks in Issue”) are the following:
Process body elpo
Process small parts elpo
Process sheet metal elpo
Central sludge
Blend
Lime slurry
Elpo waste
PW1 process waste
PW2 process waste
PW3 process waste
Cl clarifier
C2 clarifier
Sludge thickener
Stage 1 phosphate
Stage 4 phosphate
Stage 5 phosphate
Stage 6 phosphate
Dump stage 1 phosphate
Dump stage 5 phosphate
Process elpo (installed 1986-1992)
Dump elpo (installed 1986-1992)
Prime sludge.
The process body elpo, process small parts elpo, process sheet metal elpo and process elpo were rectangular steel tanks without tops, delivered to the plant in sections which were welded together on site. The inside of each tank was'coated with a material which would not conduct electricity. The tanks were filled with liquid containing a special paint. The liquid was given an electric charge resulting in the electroplating of the paint on automobile bodies, small parts and sheet metal as a conveyor moved them through the appropriate tank. Each of the tanks was welded to steel beams embedded in the concrete plant floor or to a steel floor plate. When the tanks were removed (in or before 1986) in connection with conversion to production of the L Car model, they were “cut up and thrown out.”
*327 The phosphate tanks installed during the 1986 through 1992 period, and which remained during the period 1993 through 2001, were rectangular in shape with a taper at the ends and no tops. The steel sections of the tanks were delivered to the subject plant and welded together on site. The tanks were welded to I-beams embedded in a concrete containment pad in which they were installed. The Stage 4 and Stage 5 phosphate tanks were insulated; Stages 1 and 6 were not. As in the elpo tanks, a vehicle was moved by conveyor through the phosphate tanks where chemicals cleaned the metal (Stages 1 and 4), a phosphate coating was placed on the metal (Stage 5), and then the metal was rinsed (Stage 6).
The phosphate and elpo dump tanks were cylindrical steel tanks used to store the phosphate or elpo liquid if access to the phosphate or elpo process tanks was necessary. The dump tanks were installed on, but not bolted or welded to, steel I-beams embedded on a concrete floor or pad. Each of these tanks had a capacity in excess of 30,000 gallons and was used solely for storage of material.
The blend, elpo waste, process waste, clarifier, and sludge thickener tanks were cylindrical tanks consisting of pre-rolled sections of steel, welded together at the plant. The tanks were welded to I-beams embedded in the concrete floor. The lime slurry tank was a cylindrical plastic tank built at the manufacturer and delivered by truck. This tank sat on a concrete floor at the wastewater treatment facility, surrounded by a containment wall. It was not otherwise attached. The clarifier and sludge thickener tanks had agitators, and the clarifier tanks had revolving blades that skimmed off sludge. Although one of plaintiffs witnesses described the three process waste tanks as “basically holding tanks,” one tank received effluent from the assembly process, and, in the second tank, the effluent was “being processed to be treated and shipped out to the publicly-owned wastewater treatment plant.” The third tank was a spare and generally was empty.
The other tanks included in the Remaining Tanks in Issue are the central sludge and the prime sludge tanks (the latter having been re-named tutone sludge for the ST Truck model). Both *328 tanks were rectangular in shape, consisted of steel plates welded together at the site, and each was installed in a fifteen-foot deep concrete pit. Neither was bolted or otherwise attached or fastened to the walls or floor of the pit. The tanks collected paint-laden water from the painting process at the plant. Chemicals were added to treat the paint and create sludge. The sludge was then skimmed off using filters, and the cleaned water was pumped back to the paint spray booths.
Based on the preceding discussion, I conclude that the 65,000 gallon elpo dump tank, the two 80,000 gallon phosphate dump tanks and the 827,300 gallon spare process waste tank are storage tanks taxable under the express provisions of N.J.S.A. 54:4-1.12. The other tanks are process tanks not covered by this statute.
The process elpo tanks and phosphate tanks were direct and integral parts of the production process. The wastewater treatment tanks, other than the spare process waste tank, were essential to, and played an active role in, the production process because they enabled the plant and the process to comply with applicable environmental laws. All of these tanks, other than the lime slurry and central and prime sludge tanks, were welded to steel beams embedded in concrete, and, therefore, were affixed to the real estate and presumptively taxable under N.J.S.A. 54:4-1. The lime slurry tank was not attached to the concrete pad on which it sat. This tank is of a relatively small size (15,000 gallons), and no special modification or adaptation of the concrete pad was made to accommodate the tank. Consequently, I conclude that the lime slurry tank was not affixed and, therefore, is not taxable under the statute.
The central and prime sludge tanks were not physically attached, but were large in size,[10] sufficiently heavy so that gravity *329 would hold them in place, and were installed in fifteen feet deep concrete pits specially constructed in the plant floor to accommodate and enclose them. Based on the discussion above, I conclude that these tanks were affixed for purposes of N.J.S.A. 54:4-1, and, therefore, are presumptively taxable.
Because all of the process tanks (other than the lime slurry tank) were affixed, their taxability must be determined under the b and a tests of N.J.S.A. 54:4-1. All of the tanks are apparatus or equipment used in business, and none is a structure or apparatus or equipment the primary purpose of which is to enable a structure to support, shelter, enclose or house persons or property as those concepts are used in the b test. The tanks, therefore, are nontaxable under the b test, and, as a result, defendant has the burden of persuasion to demonstrate taxability under the a test.
Defendant presented no evidence to demonstrate that removal of any of the Remaining Tanks in Issue, other than the central and prime sludge tanks, would cause material injury to the real estate. As to the sludge tanks, defendant presented no evidence as to the length and width of the pits in which the tanks were installed or as to what repair work to the pits would be necessary if the tanks were removed. However, each tank has a large cubic and square foot area (see footnote 10 above). Removal of either tank would require a repair to the plant floor at least as extensive as that required in connection with removal of a flat-top conveyor (see Section VI of this Opinion). Consequently, I conclude that the sludge tanks could not be removed without material injury to the real estate.
The evidence demonstrated that the elpo tanks, phosphate tanks and sludge tanks could not be removed without material injury to themselves. The removal process would involve cutting the tanks apart with oxyacetylene torches. One of plaintiffs witnesses *330 testified that, when tanks similar to the process elpo tanks were removed, they were cut apart and scrapped.
The evidence also demonstrated that no tanks of the types in issue were removed and relocated or sold in connection with the closure of eleven of plaintiffs automobile assembly plants, including Framingham, Massachusetts. (No testimony was presented as to the remaining eighteen closed plants.) From this evidence, and the testimony as to the cutting apart and scrapping of similar tanks, I infer and conclude that all of these tanks were ordinarily intended to be affixed permanently.
In order to be nontaxable under the a test, the personal property must satisfy all three elements of the a test. Because the sludge tanks do not satisfy any of the elements, and the other Remaining Tanks in Issue do not satisfy the second and third elements, that is, they cannot be removed without material injury to themselves and they are ordinarily intended to be affixed permanently, I conclude that all of these tanks are taxable under the a test.
XII.
Conclusion
This Opinion has addressed the issue of the taxability (but not the value) of the various items of Manufacturing Property. The extent to which those items contribute to the taxable value of the subject plant is a function of the highest and best use of the plant. The issue of highest and best use is the next issue to be heard. The taxable value of the plant for each year under appeal will be determined in the third stage of these proceedings.

The version of this-Opinion issued on February 21, 2002 contained Sections I through VIII. Section VIII was entitled "Conclusion.” It recited that the Opinion did not address all items of personal property in dispute and that the parties had been directed to attempt to reach agreement as to the taxability of those items not discussed in Sections IV through VII of the Opinion. Plaintiff then filed an application for leave to appeal to the Appellate Division which was denied. Plaintiffs application for leave to appeal to the Supreme Court was also denied. (After issuance of this opinion, the application was denied.) The parties have been unable to reach any agreement as to the taxability of the items of personal property not discussed in the February 21, 2002 Opinion. I address the taxability of those items in replacement Section VIII and new Sections IX through XI of this Opinion. Sections I through VII of the Opinion are unchanged from the February 21, 2002 version.

 The burden of producing evidence means “the obligation of a party to introduce evidence when necessary to avoid the risk of a judgment or peremptory finding against him on an issue of fact." N.J.R.E. 101(b)(2). See also, 2 McCormick on Evidence § 336 (Strong ed., 5th ed.1999).

 The burden of persuasion means "the obligation of a party to meet the requirements of a rule of law that the fact be proved either by a preponderance of the evidence or by clear and convincing evidence or beyond a reasonable doubt, as the case may be.” N.J.R.E. 101(b)(1). See also, 2 McCormick on Evidence, supra § 336 (commenting that "the principal significance of the burden of persuasion is limited to those cases in which the trier of fact is actually in doubt”). In a tax appeal proceeding, the standard of proof is "preponderance of the evidence.” E.g., WCI-Westinghouse, Inc. v. Edison Tp., 7 N.J.Tax 610, 617 (Tax 1985), aff'd, 9 N.J.Tax 86 (App.Div.1986).

 The b test expressly describes "pipe racks, and piping and electrical wiring up to the point of connections with the machinery, apparatus, or equipment of a production process" as real property and excludes from personal property "structurefs]" and "machinery, apparatus or equipment the primary puipose of which is to enable a structure to support, shelter, contain, enclose or house persons or property."

 If the court determines that the taxpayer has not satisfied its burden of persuasion as to the a test, and the municipality, by counterclaim, seeks an increase in assessment based on the taxability of personal property, the municipality will have the burden of persuasion as to the a test in connection with the claim for increase.

 The grinder booth for the L-Car model, as described above was bolted to the truss work of the building.

 This tank and the blend, lime slurry, process waste, and clarifier tanks were part of the wastewater treatment facility at the subject plant. This facility was granted an exemption from taxation commencing in tax year 1989 and continuing through 2001. The issue of the qualification of the facility for exemption for tax years 1986 through 1988 was not included in the hearing which is the basis for this Opinion. The issue will be decided separately. This Opinion assumes, without deciding, that the tanks in question did not qualify for exemption in 1986, 1987, and 1988.

 As noted in Section II of this Opinion, the Tax Court held that this statute was facially constitutional. General Motors Corp. v. Linden, supra, 17 N.J. Tax at 17. Neither the Appellate Division, supra, 293 N.J.Super. 99, 679 A.2d 718, nor the Supreme Court, supra, 150 N.J. 522, 696 A.2d 683, addressed the constitutionality of this statute. Neither party has asserted a constitutional challenge before me, and, therefore, I need not consider the issue.

 In City of Bayonne v. Port Jersey Corp., 79 N.J. 367, 399 A.2d 649 (1979), the New Jersey Supreme Court held that similar cranes were not taxable under the then Business Personal Property Tax Act, N.J.S.A. 54:11 A — 1 to -21 (repealed by L. 1993, c. 174, § 1) which employed a standard for taxability as real estate (“so affixed to real property as to become part thereof and not to be severable or removable without material injury thereto,” NJ.S.A. 54:1 lA-2(b)(2)) significantly different from that contained in N.J.S.A. 54:4-1. The Court did not address the meaning of “affixed” or the constitutional implications of the statutory standard.

 A gallon contains 231 cubic inches, Meiriam-Webster’s Collegiate Dictionary, supra at 477, and a cubic foot contains 1728 cubic inches. Therefore, the central sludge tank, with a capacity of 90,000 gallons, contains over 12,000 cubic feet. The tank is 15 feet deep, resulting in a square foot area of approximately 800 square feet. The prime sludge tank had a capacity of 60,000 gallons or *329 approximately 8000 cubic ieet. This tank was also 15 feet deep, resulting in a square foot area of approximately 535 square feet.